McMILLAN, Judge.
The appellant, James Ben Brownfield, Jr., was convicted of three counts of capital murder for killing Brenda McCutchin, Joshua Hodges, and Latham McCutchin. Count I charged Brownfield with murdering Latham McCutchin during the course of a burglary. See § 13A-5-40(a)(4), Ala. Code 1975. Count II charged Brownfield with murdering Brenda McCutchin, Joshua Hodges, and Latham McCutchin during one act or pursuant to one scheme or course of conduct. See § 13A-5^40 (a)(10), AIa.Code 1975. Count III charged Brownfield with murdering Joshua Hodges, who was under 14 years of age. See § 13A-5-40(a)(15), Ala.Code 1975. The jury recommended by a vote of 11-1 that Brownfield be sentenced to death. The trial court accepted the jury’s recommendation and sentenced Brownfield to death. This appeal followed.
The trial court set out the following statement of the evidence, which we adopt:
“At some time in the late evening hours of December 23, 2001, or the early morning hours of December 24, 2001, Brenda Whitehead McCutchin, Joshua Dewayne Hodges, and Latham Durwood McCutchin were murdered in their homes in Scottsboro, Alabama. At the time of their deaths, Brenda was forty-seven years old, Joshua was three years old, and Latham was sixty-four years old.
“After consuming Xanax pills on the night of December 23, 2001, the twenty-seven year old defendant, James Ben *7 Brownfield, Jr., became enraged with his sister, Brenda Whitehead McCutch-in, over drugs and money. While Brenda and her grandson, Joshua Dewayne Hodges, were sleeping in their bed, the defendant decided to kill his sister and her estranged husband, Latham Dur-wood McCutchin. The defendant took a claw hammer into the room where Brenda and Joshua were sleeping and hit Brenda with it. When the defendant hit Brenda, Joshua awoke crying. At that time, the defendant began hitting both Brenda and Joshua with the claw hammer. Brenda suffered approximately twenty forceful blows to the head and other injuries to her body. Joshua suffered approximately sixteen blows to the head and other injuries to his body. Both Brenda and Joshua died from multiple blunt-force injuries. Before he left Brenda’s house, the defendant attempted to burn the house with kerosene and a cigarette.
“After killing Brenda and Joshua, the defendant took the claw hammer and a set of clean clothes and drove across town to the residence of his brother-in-law, Latham Durwood McCutchin. The defendant initially pretended a friendly visit with Latham but later inside the residence, the defendant informed La-tham that he was going to kill him. The defendant and Latham struggled for the claw hammer with the defendant subduing Latham by hitting him with his fists and the hammer. Latham suffered numerous injuries. He suffered at least ten forceful blows to the head with the claw hammer, bruising to the lower chest, arms, and hands, fractured ribs and a fractured vertebra. Later, the defendant stabbed Latham in the heart and cut his throat with a knife. Latham died from multiple blunt-force injuries. After killing Latham, the defendant showered and dressed in the clean clothes. He gathered the soiled clothes, claw hammer, and knife and placed them in a garbage bag that he found at La-tham’s house.
“The defendant left Latham’s house and went to a Christmas party where he saw friends and acquaintances. He told his friend, Nick Logan, that he was moving to Tennessee because he and Brenda had argued and she had kicked him out of the house. Later, the defendant left the party and drove toward Tennessee to Stevenson, Alabama. He placed the garbage bag of evidence in a dumpster in Stevenson and drove back to Scotts-boro. The defendant had contact with friends throughout the day of December 24, 2001. The night of December 24, 2001, the defendant went to Tammy Farmer’s apartment. During conversations with Tammy, his girlfriend, the defendant confessed to the murders of Brenda, Joshua, and Latham.
“Concerned about his father, Rodney McCutchin traveled to Latham McCutchin’s house. Rodney and his son found the body of Latham and called 911. The Scottsboro Police Department immediately began an investigation into the death of Latham. During the investigation, they obtained information that implicated Brenda McCutchin and her brother, the defendant, James Ben Brownfield, Jr. On the morning of December 25, 2001, the Scottsboro Police Department obtained a search warrant to search the home of Brenda McCutch-in. Upon searching the home, the police discovered the bodies of Brenda and her grandson, Joshua. The Scottsboro Police Department intensified their search for Brenda’s car and the defendant.
“At approximately 10:00 A.M. on December 25, 2001, the Scottsboro Police Department located Brenda’s car and the defendant at the apartment of defen *8 dant’s girlfriend, Tammy Farmer. The defendant was apprehended and transported to the Scottsboro Police Department. On December 25 and 26, 2001, the defendant gave Investigators Robert Petty and Doug Hood of the Scottsboro Police Department a statement of confession to the murders.”
(C. 345-347.) The trial court also noted that the evidence indicated that Brownfield wrote messages on the walls of both residences: At Latham’s house Brownfield wrote “This was necessary Ben. I’m sorry for your family. They deserved it.” (C. 351);[1] and at Brenda’s residence those messages were throughout the house and included comments such as “ ‘Fuck this God,’ ‘Fuck this world,’ ‘I’ll be dead too,’ ‘It’s about to pick up,’ ‘Don’t look for me,’ ‘Tammy I love you Always Never 4-get Baby,’ ‘Killing is my business,’ and ‘My whole life I have been ran over. It’s stopping now.’ ” (C. 353.)
The evidence further indicated that although Brenda McCutchin and Latham McCutchin were married, they were separated and no longer lived together, and that Brownfield lived with Brenda and Joshua at Brenda’s house on Wallace Lane in Scottsboro. The evidence also indicated that the victims did not die immediately upon the striking of the first blows; rather, they survived for some period before succumbing to their injuries. Further, each of the victims had what were characterized as defensive wounds, indicating that they attempted to ward off at least some of the blows from the hammer. Finally, Brownfield presented evidence indicating that he had consumed seven or eight Xanax pills on the night of the murders and that he had also used crystal methamphetamine a number of times in the week preceding the murders.
The jury convicted Brownfield of three counts of capital murder. A separate sentencing hearing was held, at which the State relied on the following aggravating circumstances to support a death sentence: that Latham was killed during a burglary; that the murders of two or more people were committed by one act or pursuant to one scheme or course of conduct; and that the murders were especially heinous, atrocious, or cruel when compared to other capital offenses. After the sentencing hearing, the jury, by a vote of 11 to 1, recommended that Brownfield be sentenced to death. The circuit court held a separate sentencing hearing pursuant to § 13A-5-47(c), Ala.Code 1975, and sentenced Brownfield to death. This appeal, which is automatic when a defendant has been sentenced to death, followed. See § 13A-5-53(a), Ala.Code 1975.

Standard of Review

Because Brownfield has been sentenced to death, this Court must review these proceedings for plain error. Rule 45A, Ala.RApp.P., states:
“In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant.”
When discussing the application of the plain-error standard of review, this Court has stated:
*9 “The standard of review in reviewing a claim under the plain-error doctrine is stricter than the standard used in reviewing an issue that was properly raised in the trial court or on appeal. As the United States Supreme Court stated in United States v. Young, 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), the plain-error doctrine applies only if the error is ‘particularly egregious’ and if it ‘seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.’ See Ex parte Price, 725 So.2d 1063 (Ala.1998), cert. denied, 526 U.S. 1133, 119 S.Ct. 1809, 143 L.Ed.2d 1012 (1999); Burgess v. State, 723 So.2d 742 (Ala.Cr.App.1997), aff'd, 723 So.2d 770 (Ala.1998), cert. denied, 526 U.S. 1052, 119 S.Ct. 1360, 143 L.Ed.2d 521 (1999); Johnson v. State, 620 So.2d 679, 701 (Ala.Cr.App.1992), rev’d on other grounds, 620 So.2d 709 (Ala.1993), on remand, 620 So.2d 714 (Ala.Cr.App.), cert. denied, 510 U.S. 905, 114 S.Ct. 285, 126 L.Ed.2d 235 (1993).”
Hall v. State, 820 So.2d 113, 121-22 (Ala. Crim.App.1999), aff'd, 820 So.2d 152 (Ala. 2001). Although the failure to object will not preclude our review, it will weigh against any claim of prejudice. See Dill v. State, 600 So.2d 343 (Ala.Crim.App.1991), aff'd, 600 So.2d 372 (Ala.1992).
I.
Brownfield contends that he is entitled to a new trial based on a number of alleged evidentiary errors.
A.
Brownfield argues that the trial court erred in admitting his confessions into evidence because, he claims, the confessions were involuntarily given without a knowing waiver of his Miranda[2] rights.[3] Specifically, Brownfield contends that he lacked the capacity to knowingly and voluntarily waive his rights because he had ingested seven or eight Xanax pills before the commission of the murders and had been using methamphetamine for two weeks before the murders.
The trial court conducted a suppression hearing at which a number of witnesses testified. Hannah Robertson testified that she and Brownfield were friends. According to Robertson, she saw Brownfield at Melinda Davidson’s house late in the evening on December 23 or early in the morning on December 24, and Brownfield told her that he had done some bad things, that he was leaving town to go to Tennessee, and that he wanted to straighten up. She stated that she took his comments to be telling her good-bye. Robertson further testified that she saw Brownfield on the evening of December 24, and that he told her at that time that he was not leaving town.
Officer Derrick Porch of the Scottsboro Police Department testified that Brownfield was located in an apartment on Sarah Betty Lane on December 25, 2001, and that he was taken into custody at that time. He stated that there were two or three officers telling Brownfield to come out of the apartment with his hands up. According to Officer Porch, Brownfield complied with the officers’ orders and came out of the apartment with his hands in the air; he lay down on his stomach, placed his hands behind his back, and was handcuffed. Officer Porch testified that Brownfield was not struck or beaten by officers when he was taken into custody, *10 nor was he threatened by any officers in Officer Porch’s presence. Officer Porch stated that approximately 15 minutes after Brownfield left the apartment and was placed in handcuffs, he transported Brownfield to the police station, which he testified was approximately a mile and a half from the apartment. Officer Porch testified that when they arrived at the station, he took Brownfield to the break area of the station and had him sit at a table. Officer Porch stated that he did not engage in any conversation with Brownfield at that time. He stated that approximately 20 minutes later, Investigator Doug Hood with the Jackson County District Attorney’s office and Investigator Robert Petty of the Scottsboro Police Department came and took custody of Brownfield. According to Officer Porch, Brownfield did not appear to be intoxicated; he did not have any trouble walking into the police station from the patrol car or sitting at the table in the breakroom; and he did not get physically ill while in Officer Porch’s presence. Officer Porch stated that he saw nothing that led him to believe that Brownfield was intoxicated.
Officer Porch testified that around 3:30 p.m. on December 26, 2001, he escorted Brownfield from the jail to his patrol car, transported him back to the police department, and released him to Investigators Hood and Petty; he stated that he did not engage in any conversation with Brownfield at that time. He further testified that at approximately 5:00 p.m. on December 26, he transported Brownfield back to the jail without conversation. Officer Porch testified that at no time while he was observing Brownfield did he or anyone in his presence use violence, make any promises or threats, or offer him any inducement to get Brownfield to make a statement.
Investigator Hood testified that Investigator Petty and he took custody of Brownfield at approximately 12:50 p.m. on December 25 to interview him and that he conducted a second interview with Brownfield at 3:28 p.m. on December 26, 2001. Investigator Hood stated that at the onset of both interviews he advised Brownfield of his Miranda rights by reading him those rights from a card, and that Brownfield checked the box on the Miranda card indicating that he understood his rights and that he wished to speak to authorities. He signed the card, and Investigator Hood and Investigator Petty also signed the card as witnesses.[4] According to Investigator Hood, Brownfield was cooperative and listened to authorities and followed directions. Investigator Hood further stated that neither he nor anyone in his presence used any violence on Brownfield, made any promises or threats to Brownfield, told him that it would be better for him to confess or to make a statement, or offered him any inducement to get him to make a statement. He testified that Brownfield was handcuffed at the beginning of the December 25 interview, but that he removed Brownfield’s handcuffs after observing his demeanor during the initial part of the interview and determining that Brownfield was being cooperative and did not pose a risk.
Investigator Petty also testified that he was present when Investigator Hood interviewed Brownfield on December 25 and 26. Investigator Petty’s testimony was substantially similar to Investigator Hood’s testimony, i.e., that Brownfield did not ap *11 pear to be intoxicated when he was being interviewed, that neither he nor anyone in his presence used any violence on Brownfield, made any promises or threats to Brownfield, told Brownfield that it would be better for him to confess or to make a statement, or offered Brownfield any inducement to get him to make a statement; he also testified that Brownfield appeared to understand his rights and that he voluntarily waived them to speak with authorities. Investigator Petty further testified that Brownfield’s eyes were not bloodshot, that he did not detect any slurred speech, and that Brownfield was quiet during portions of the interview but not hard to understand.
Investigator Petty also testified that he transported Brownfield back to the jail following the first interview, and that Brownfield agreed to take officers to the location in Tennessee where he had discarded the bag containing the bloody clothing, the hammer, the knife, and La-tham’s wallet. According to Investigator Petty, they went to a restaurant where Brownfield claimed to have discarded the items, but were unable to locate any evidence.
Although Brownfield did not present any witnesses at the suppression hearing, he did file a number of ex parte motions with the trial court regarding his expert witnesses and the manner in which the defense contended Xanax and other medications affect an individual’s mental state.[5]
“ ‘The trial court held the suppression hearing outside the hearing of the jury; therefore, we review the evidentiary findings of the trial court at that hearing under the ore tenus standard.’ Ex parte Jackson, 886 So.2d 155, 159 (Ala.2004). ‘When evidence is presented ore tenus to the trial court, the court’s findings of fact based on that evidence are presumed to be correct,’ Ex parte Perkins, 646 So.2d 46, 47 (Ala.1994); ‘[w]e indulge a presumption that the trial court properly ruled on the weight and probative force of the evidence,’ Bradley v. State, 494 So.2d 750, 761 (Ala.Crim.App. 1985), aff'd, 494 So.2d 772 (Ala.1986); and we make ‘ “all the reasonable inferences and credibility choices supportive of the decision of the trial court.” ’ Kennedy v. State, 640 So.2d 22, 26 (Ala.Crim.App.1993), quoting Bradley, 494 So.2d at 761. ‘ “ ‘Where evidence is presented to the trial court ore tenus in a nonjury case, a presumption of correctness exists as to the court’s conclusions on issues of fact; its determination will not be disturbed unless clearly erroneous, without supporting evidence, manifestly unjust, or against the great weight of the evidence.’ ” ’ Ex parte Jackson, 886 So.2d at 159, quoting State v. Hill, 690 So.2d 1201, 1203 (Ala.1996), quoting in turn Ex parte Agee, 669 So.2d 102, 104 (Ala.1995).
“However, ‘[t]he ore tenus presumption of correctness applies to findings of fact, not to conclusions of law.’ City of Russellville Zoning Bd. of Adjustment v. Vernon, 842 So.2d 627, 629 (Ala.2002). ‘[T]he ore tenus rule does not extend to cloak a trial judge’s conclusions of law, *12 or incorrect application of law to the facts, with a presumption of correctness.’ Eubanks v. Hale, 752 So.2d 1113, 1144-45 (Ala.1999). ‘ “ ‘[W]hen the trial court improperly applies the law to the facts, no presumption of correctness exists as to the court’s judgment.’ ” ’ Ex parte Jackson, 886 So.2d at 159, quoting Hill, 690 So.2d at 1203, quoting in turn, Ex parte Agee, 669 So.2d at 104. Thus, we review the trial court’s conclusions of law and its application of law to the facts under the de novo standard of review.”
Washington v. State, 922 So.2d 145, 157-58 (Ala.Crim.App.2005).
“When reviewing a ruling on the vol-untariness of a confession, we apply the standard articulated by the Alabama Supreme Court in McLeod v. State, 718 So.2d 727 (Ala.1998):
“ ‘For a confession, or an inculpato-ry statement, to be admissible, the State must prove by a preponderance of the evidence that it was voluntary. Ex parte Singleton, 465 So.2d 443, 445 (Ala.1985). The initial determination is made by the trial court. Singleton, 465 So.2d at 445. The trial court’s determination will not be disturbed unless it is contrary to the great weight of the evidence or is manifestly wrong. Marschke v. State, 450 So.2d 177 (Ala.Crim.App.1984)....
“ ‘The Fifth Amendment to the Constitution of the United States provides in pertinent part: “No person ... shall be compelled in any criminal case to be a witness against himself. ...” Similarly, § 6 of the Alabama Constitution of 1901 provides that “in all criminal prosecutions, the accused ... shall not be compelled to give evidence against himself.” These constitutional guarantees ensure that no involuntary confession, or other in-culpatory statement, is admissible to convict the accused of a criminal offense. Culombe v. Connecticut, 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961); Hubbard, v. State, 283 Ala. 183, 215 So.2d 261 (1968).
“ ‘It has long been held that a confession, or any inculpatory statement, is involuntary if it is either coerced through force or induced through an express or implied promise of leniency. Bram v. United States, 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897). In Culombe, 367 U.S. at 602, 81 S.Ct. at 1879, the Supreme Court of the United States explained that for a confession to be voluntary, the defendant must have the capacity to exercise his own free will in choosing to confess. If his capacity has been impaired, that is, “if his will has been overborne ” by coercion or inducement, then the confession is involuntary and cannot be admitted into evidence. Id. (emphasis added).
“‘The Supreme Court has stated that when a court is determining whether a confession was given voluntarily it must consider the “totality of the circumstances.” Boulden v. Holman, 394 U.S. 478, 480, 89 S.Ct. 1138, 1139-40, 22 L.Ed.2d 433 (1969); Greenwald v. Wisconsin, 390 U.S. 519, 521, 88 S.Ct. 1152, 1154, 20 L.Ed.2d 77 (1968); see Beecher v. Alabama, 389 U.S. 35, 38, 88 S.Ct. 189, 191, 19 L.Ed.2d 35 (1967). Alabama courts have also held that a court must consider the totality of the circumstances to determine if the defendant’s will was overborne by coercion or inducement. See Ex parte Matthews, 601 So.2d 52, 54 (Ala.) (stating that a court must analyze a confession by looking at the totality of the circumstances), cert. denied, 505 U.S. 1206, 112 S.Ct. 2996, 120 L.Ed.2d 872 (1992); Jackson v. State, 562 So.2d 1373, 1380 (Ala. *13 Crim.App.1990) (stating that, to admit a confession, a court must determine that the defendant’s will was not overborne by pressures and circumstances swirling around him); Eakes v. State, 387 So.2d 855, 859 (Ala.Crim.App. 1978) (stating that the true test to be employed is “whether the defendant’s will was overborne at the time he confessed”) (emphasis added).’
“718 So.2d at 729 (footnote omitted).”
Robitaille v. State, 971 So.2d 43, 55-56 (Ala.Crim.App.2005).
Additionally, we note that “intoxication” has been defined by the Alabama Legislature to include “a disturbance of mental or physical capacities resulting from the introduction of any substance into the body.” § 13A-3-2(e)(l), Ala.Code 1975. As this Court stated in Hubbard v. State, 500 So.2d 1204, 1218 (Ala.Crim.App. 1986):
“In order for intoxication to render a confession inadmissible, it must be shown that the mind of the defendant was substantially impaired when the confession was made. Moore v. State, 488 So.2d 27 (Ala.Cr.App.1986); Moore v. State, 415 So.2d 1210 (Ala.Cr.App.), cert. denied, 415 So.2d 1210 (Ala.), cert. denied, 459 U.S. 1041, 103 S.Ct. 459, 74 L.Ed.2d 610 (1982), and cases cited therein. ‘Intoxication, short of mania or such impairment of the will and mind as to make an individual unconscious of the meaning of his words, will not render a statement or confession inadmissible.’ Tice v. State, 386 So.2d 1180, 1185 (Ala.Cr.App.), cert. denied, 386 So.2d 1187 (Ala.1980). See also Palmer v. State, 401 So.2d 266, 268 (Ala.Cr.App.), cert. denied, 401 So.2d 270 (Ala.1981), cert. denied, 455 U.S. 922, 102 S.Ct. 1280, 71 L.Ed.2d 463 (1982).
“The voluntariness of an alleged confession is a question of law addressed to the trial court, whose ruling will not be disturbed on appeal unless it appears to be contrary to the great weight of the evidence or is manifestly wrong. Tice v. State, supra; Garrison v. State, 372 So.2d 55 (Ala.Cr.App.1979). The degree of intoxication which would affect the voluntariness of a statement is a question of fact initially addressed to the trial court and, depending upon its ruling, then to the jury for its consideration. Tice v. State, 386 So.2d at 1185.”
Here, the trial court was presented with conflicting evidence, and resolved the credibility choices adversely to Brownfield. In its order denying Brownfield’s motion to suppress the confessions and the evidence seized at the time of Brownfield’s arrest, the trial court set out the following statement of the facts:
“The defendant moves to suppress statements made by the defendant to investigators after his arrest. The defendant was taken into custody by Officer Derrick Porch of the Scottsboro Police Department on December 25, 2001, at 12:00 P.M. Officer Porch transported the defendant to the Scottsboro Police Department. He testified that he remained in the break room with the defendant until Detectives Doug Hood and Bob Petty took custody of the defendant. Officer Porch testified that at no time was the defendant beaten, threatened, or offered promises. Officer Porch testified that the defendant never said anything to him. Officer Porch stated that the defendant did not appear to be intoxicated, that he was never physically sick, that he had no trouble walking, that he wasn’t jittery, and that he followed instructions and responded appropriately. Detective Hood testified that he took custody of the defendant at approximately 12:45 P.M. for the purpose of interviewing the defendant. He *14 testified that the defendant did not appear to be intoxicated. He stated that the first thing he did was advise the defendant of his Miranda rights. Detective Hood read the Miranda rights to the defendant from a Miranda card at 12:52 P.M. Immediately after Detective Hood read the rights from the Miranda card, the defendant told the detective that he understood his rights and agreed to talk to the detectives. The defendant gave a statement to the detectives that Detective Petty reduced to writing. The defendant signed the written statement and Miranda card after the interview. The defendant’s statement of December 25, 2001, is partially recorded by videotape. The beginning of the interview is not recorded by videotape because the detectives did not have access to the equipment. Detective Hood made the decision to proceed with the interview without the video recording because of his legitimate concern that there could be other undiscovered victims and that time was of the essence. Detective Hood testified that at no time was the defendant threatened, physically harmed, or given promises or inducements of any kind. Detective Petty testified that he, Detective Hood, and the defendant were present for the interview. He stated that neither he nor Detective Hood applied any violence, threatened, or offered any promise or inducement to the defendant. After the interview at the Scottsboro Police Department, the defendant agreed to go to Stevenson with Detective Petty to identify the place he had described in his statement. Major Ralph Dawe questioned the defendant regarding the place when they arrived in Stevenson. This questioning took place approximately forty-five minutes after the defendant had received his Miranda rights and had waived them. Detective Petty testified that he was present during the questioning and that no one applied any violence, threatened, or offered any promise or inducement to the defendant.
“The defendant gave another statement to the police on December 26, 2001. The entire statement was recorded by videotape. Detectives Hood and Petty conducted the interview. Prior to the statement, the defendant was read his Miranda rights and waived them. At no time did Detective Hood or Detective Petty physically harm, threaten, or offer any promise or inducement to the defendant.
“The court is mindful that, due to the right against self-incrimination, an involuntarily given incriminating statement is not admissible in a subsequent criminal prosecution. The court finds from the evidence that the defendant’s statements to Detectives Hood and Petty and Major Ralph Dawe were made freely and voluntarily. The court further finds based on the totality of the circumstances that the defendant knowingly and voluntarily waived his Miranda rights.”
(C. 175-177.) Similarly, the trial court found as follows in its sentencing order:
“The court has fully considered the testimony of Dr. Roger Lacy, Dr. Lee Evans, Dr. Melissa Clinger, and all other witnesses during the guilt and penalty phases of the trial. The defendant maintains that he was under the influence of extreme mental or emotional disturbance due to his use of crystal methamphetamine and Xanax. In his confession to law enforcement, the defendant indicated that he had taken seven or eight Xanax pills prior to the three murders. The defendant did not reveal to law enforcement that he had been using crystal methamphetamine each day of the week prior to the murders. The first evidence of defendant’s use of *15 crystal methamphetamine was reported by Dr. Melissa Clinger in her Forensic Evaluation Report. The information was provided to Dr. Clinger by the defendant during the evaluation process. Later, the defendant reported to Dr. Lacy and Dr. Evans that he had been on a crystal-methamphetamine binge the week prior to the murders. He also reported to the experts that he had taken Xanax the night of the murders. The defendant’s friends testified that the defendant was a frequent user of crystal methamphetamine. The court does not doubt that the defendant was using crystal methamphetamine the week prior to the crimes and Xanax the night of the crimes. The court, however, has no credible evidence regarding the quantity of drugs ingested by the defendant or the times of ingestion. Furthermore, the evidence indicates that over time people develop immunities and tolerance to the effects of drugs. The defendant had been abusing drugs for years. The court finds by a preponderance of the evidence that the defendant did not commit the murders while under the influence of extreme mental or emotional disturbance. The defendant’s demeanor and actions immediately following the crimes indicate otherwise. The defendant’s friends and acquaintances testified that the defendant acted normally shortly after the murders. Teresa Manning testified that she saw the defendant at the store where she worked, on December 24, 2001, at 1:00 A.M. or 1:30 A.M. She said that she and the defendant carried on a conversation and that there was nothing unusual about how the defendant was acting. The defendant attended a party immediately after the murders. Hannah Robertson testified that she saw the defendant at the party between 1:00 A.M. and 2:00 A.M. on December 24, 2001. She said the defendant looked better than usual. She said that the defendant’s hair looked wet. She carried on a conversation with the defendant and said that he seemed normal, that he could talk very good, and did not appear to be intoxicated. Nick Logan, the defendant’s best friend, testified that he saw the defendant at the party on December 24, 2001. In fact, he and the defendant left the party and rode around for approximately twenty minutes. Mr. Logan talked with the defendant for a long period of time shortly after the murders and he said that the defendant did not appear to be intoxicated. He said he noticed nothing out of the ordinary. The court does not find that the defendant was so impaired that he was suffering from an extreme mental or emotional disturbance at the time of the offenses.”
(C. 355-357.)
The evidence indicated that Brownfield committed the murders sometime during the evening of December 23, 2001, or the early morning hours of December 24, 2001. The evidence further indicated that in the early morning hours of December 24, 2001, Brownfield went to a party and engaged in what witnesses testified can best be described as normal, coherent conversation. Upon his arrest around noon on December 25, 2001, Brownfield confessed to the murders. He also confessed in a second interview with authorities on the afternoon of December 26, 2001. A number of law-enforcement officials testified that when he made his confessions Brownfield appeared to be coherent, did not appear to be intoxicated or under the influence of any substance, and appeared to understand his rights and voluntarily waived them without threat, promise, or inducement. It is clear that the trial court determined that Brownfield was not so affected by his purported ingestion of Xanax on the night of *16 the murders and crystal methamphetamine in the weeks leading up to the murders that he was unable to knowingly and voluntarily waive his Miranda rights. We have reviewed the transcript, the videotapes of the two recorded confessions, and the other evidence in the record relevant to this issue, and we conclude that the record supports the trial court’s findings. The trial court did not abuse its discretion in denying Brownfield’s motion to suppress his confessions on this ground.[6]
B.
Brownfield also claims that the trial court erred in denying his motion to suppress photographs of items seized from his automobile because, he claims, his consent to the search of the vehicle was involuntary.[7] The photographs showed bags from a Wal-Mart discount store containing clothing Brownfield purchased after the murders. In a scattergun manner, Brownfield avers that he consented to the search only upon an overwhelming show of force by the police, because of his alleged compromised mental state caused by his drug use, and because he was not first advised of his Miranda rights before consenting to the search.
At the suppression hearing, Captain Ralph Dawe of the Scottsboro Police Department testified that Brownfield consented to a search of the vehicle after he was arrested. According to Captain Dawe, the automobile was searched for weapons or bloody clothing, and officers discovered, among other things, deodorant, a hair trimmer, and several articles of clothing.
Further, as is discussed in Part I.A. above, Officer Porch testified that two or three officers ordered Brownfield to come out of the apartment with his hands up; that Brownfield complied with the officers’ orders and came out of the apartment with his hands in the air, lay down on his stomach, and placed his hands behind his back, and was placed in handcuffs at that time. The undisputed testimony indicated that Brownfield was not struck or beaten by officers when he was taken into custody, nor was he threatened by any officers in Officer Porch’s presence.
With regard to Brownfield’s alleged intoxication rendering his consent involuntary, as we have already discussed in Part I.A. above, the trial court found from the conflicting evidence that Brownfield was not intoxicated at the time of the murders, at the time of his arrest, or at the time he made his statements to the authorities. For the same reasons stated in Part I.A., Brownfield is not entitled to any relief on this claim.
Similarly, Brownfield is not entitled to any relief based on his contentions *17 that the search of the vehicle was conducted before he was advised of his Miranda rights and that he consented to the search only in the face of overwhelming force from the police. As this Court recently stated in Washington, supra:
“ ‘This court has long held that war-rantless searches are per se unreasonable, unless they fall within one of the recognized exceptions to the warrant requirement.’ Rokitski v. State, 715 So.2d 859, 861 (Ala.Crim.App.1997). ‘One of the exceptions to the rule that a war-rantless search is per se unreasonable is a search conducted with the consent of the owner.’ Foldi v. State, 861 So.2d 414, 422 (Ala.Crim.App.2002). ‘Consent to a search must be knowingly, intelligently, and freely given.’ Ex parte Wilson, 571 So.2d 1251, 1255 (Ala.1990). ‘ “[W]here the validity of a search rests on consent, the State has the burden of proving that the necessary consent was obtained and that it was freely and voluntarily given, a burden that is not satisfied by showing a mere submission to a claim of lawful authority.’” Miller v. State, 602 So.2d 488, 491 (Ala.Crim.App.1992), quoting Florida v. Royer, 460 U.S. 491, 497 (1983). ‘[T]he question whether a consent to a search was in fact “voluntary” or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of the circumstances.’ Schneckloth v. Bustamonte, 412 U.S. 218, 227, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). ‘Factors relevant to this determination include the circumstances under which the defendant came into custody, the defendant’s awareness of the right to withhold consent, the defendant’s performance of cooperative acts, the defendant’s age, intelligence, and education, and the nature of police behavior.’ Cable v. State, 540 So.2d 769, 774 (Ala.Crim.App.1985).
“ ‘No particular factor should be given undue weight in determining the issue of voluntariness. The fact that a defendant was not informed of the right to refuse to consent does not, of itself, negate a finding of voluntariness. Nor does the fact that the defendant was in police custody or that the officers made a showing of force. Kennedy v. State, 640 So.2d 22, 24-5 (Ala.Cr. App.1993), quoting Martinez v. State, 624 So.2d 711, 715-16 (Ala.Cr.App.1993).’
“Rokitski, 715 So.2d at 861-62. See also United States v. Watson, 423 U.S. 411, 424 (1976) (‘[T]he fact of custody alone has never been enough in itself to demonstrate a coerced confession or consent to search. Similarly, under Schneckloth [v. Bustamonte, 412 U.S. 218, 234 (1973) ], the absence of proof that [a defendant] knew he could withhold his consent, though it may be a factor in the overall judgment, is not to be given controlling significance.’). ‘However, although not dispositive of the question of voluntariness, the fact that a defendant had been advised of his Miranda rights and of his right to refuse the request to search are significant factors in determining whether the consent was voluntary.’ Foldi, 861 So.2d at 422. See also United States v. Mendenhall, 446 U.S. 544, 558-59, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980) (‘Although the Constitution does not require “proof of knowledge of a right to refuse as the sine qua non of an effective consent to a search,” [Schneckloth v. Bustamonte, 412 U.S. 218, 234 (1973) ] (footnote omitted), such knowledge was highly relevant to the determination that there had been consent.’).”
Washington v. State, 922 So.2d at 163-64.
Here, Brownfield, who was 27 years old at the time of his arrest, was ordered out *18 of the apartment by a number of armed officers and was instructed to lay down in the ground, at which time he was handcuffed. Officers then requested his permission to search the vehicle. However, under the specific facts of this case, it appears that the consent was knowingly and freely given. As has been thoroughly discussed, there is no indication that Brownfield was under the influence of alcohol or any narcotic substance at the time he consented to the search, despite his claims that he took a number of Xanax a day and a half before the search and that he had been using crystal methamphetamine for two weeks before the search. The overwhelming evidence, specifically the abundance of testimony from law enforcement and Brownfield’s friends alike, indicated that he was not under the influence at the time of his arrest and subsequent consent to the search of the vehicle. Further, he was cooperative with authorities from the instant he encountered them at the apartment. Finally, there is no indication that Brownfield was unaware of or incapable of refusing to consent to the search. Rather, considering the totality of the circumstances and resolving all credibility choices in favor of the trial court’s ruling, we conclude that after being lawfully arrested Brownfield voluntarily consented to the search, even without first being advised of his Miranda rights, and that that consent was freely offered without regard to the show of force by the police in taking Brownfield into custody.
Moreover, consent is not the lone exception to the warrant requirement. Rather, there are a number of additional exceptions, including (1) a search incident to a lawful arrest and (2) probable cause. See State v. Gargus, 855 So.2d 587 (Ala.Crim.App.2003). Both exceptions apply in this case. For these reasons, we cannot say that the trial court erred in denying Brownfield’s motion to suppress the photographs of the items discovered in the automobile.
C.
Brownfield next contends that the trial court allowed improper hearsay testimony. Specifically, he claims that Virginia Goode was allowed to testify that “her brother [Charles Jackson] had called her at approximately noon on December 25, 2001, and told her that Tammy Farmer had said that there were two bodies in a home on Wallace Lane and that ‘this guy’ had killed them. (R. 1122.)” (Brownfield’s brief at p. 40.)
Prior to Goode’s testimony, Tammy Farmer testified that she and Brownfield dated “off and on” (R. 1085) and that she also dated Charles Jackson. (R. 1087.) According to Farmer, Brownfield admitted to her sometime late in the evening of December 24 or early in the morning of December 25 that he had killed Brenda, Josh, and his brother-in-law, and described the killings in some detail. Farmer testified that Brownfield finally went to sleep at approximately 4:00 a.m. on December 25, 2001, at which time she also went to sleep. She further testified that at approximately 11:15 a.m. on December 25, 2001, she telephoned Jackson and “proceeded to tell him what had happened.” (R. 1108.) Farmer stated that the police arrived at her apartment shortly after she spoke with Jackson.
Also before Goode’s testimony, Larry Duncan, director of the Jackson County 911 emergency line, testified that someone placed an emergency 911 call at approximately noon on December 25, 2001, and reported two bodies in a house. According to Duncan, there was no audiotape of the 911 call, but the notion on the dispatcher’s log indicated as follows:
*19 “On 12/25/2001, at 11:48, operator 720 received a call on the Scottsboro Police Department line. And he entered it as a 1095, which is record, because he didn’t know what to do with it at that time. And it was a call by an unknown female who refused to identify herself, and she advised that she had knowledge of a female and child dead at a residence on Wallace Lane and would not say how she knew. And, once again, she refused her name, and advised the location as the second residence on the left.”
(R. 1115.) Duncan identified additional notations on the log as indicating that law enforcement was notified of the call and reflecting the 911-dispatch operator’s efforts to trace the emergency call to ascertain the caller’s telephone number.
Goode testified that Charles Jackson was her brother, and that she received a telephone call from him “just before lunch.” (R. 1120.) The following exchange then occurred:
“[Prosecutor]: Okay, and after you spoke with your brother, did you call 911?
“[Goode]: Yes.
“[Prosecutor]: And what did you tell them when you called?
“[Defense counsel]: Judge, I object, and could we have a sidebar?
“THE COURT: All right.
“(At this time, a bench conference was held off the record.)
“[Defense counsel]: Your Honor, [the prosecutor] did not ask what was told her, but this appears to be the same thing as hearsay. And he’s asking her to relay her conclusions concerning the truth of what was conveyed to her. And it seems like it’s just a back door attempt to get hearsay in. And it seems like that we need to call Mr. Jackson first as to what he told his sister. And I haven’t thought about it until just now, but it seems like it’s just a way to get around the hearsay rule because it’s clearly — if he asks the witness what Charles Jackson told, then he’s getting into—
“[Prosecutor]: Well, Your Honor, that’s correct, but I don’t think that qualifies as hearsay. But I’m showing what he told her for her state of mind that caused her to call 911. But that would go to the truth of the statement that she made and her actions as a result of that phone call, and I don’t think it is hearsay.
“THE COURT: Well, what are you offering it for?
“[Prosecutor]: All I’m going to do is ask did she call 911 and about what time. And the record has already been entered into evidence, and I’m basically — -well, she was the one that made the call, and that’s all this is.
“[Defense counsel]: Well, this will necessitate us having to get Charles Jackson subpoenaed here at some point, and I’m not sure if he’s been subpoenaed, but I guess I can ask her.
“THE COURT: All right; I’ll overrule your objection.
“[Prosecutor]: Now, when did you call 911?
“[Goode]: When?
“[Prosecutor]: Yes, ma’am.
“[Goode]: It was about lunchtime.
“[Prosecutor]: And, again, on December 25, 2001?
“[Goode]: Yes.
“[Prosecutor]: And do you recall what you told them?
“[Goode]: Do I recall what I told them?
“[Prosecutor]: Yes, ma’am.
“[Goode]: I told them that my brother had called me and said that Tammy had called him—
*20 “[Defense counsel]: Judge, I object to what Charles Jackson has told. That would be hearsay.
“[Prosecutor]: Well, I think she’s reciting the conversation that she had with the 911 operator.
“THE COURT: I’ll allow her to testify about that.
“[Prosecutor]: Now, what did you tell the 911 operator?
“[Goode]: I told the 911 operator that there was two bodies in a home on Wallace Lane and that this guy had killed them and that they were in that home.
“[Prosecutor]: Okay, and did you somewhat give a description on how to get to that home?
“[Goode]: Yes, sir, I did. I said it was the second house on the left on Wallace Lane.
“[Prosecutor]: Now, do you know Ben Brownfield?
“[Goode]: No, I do not.
“[Prosecutor]: And on December 25, 2001, did you know a Tammy Farmer?
“[Goode]: No, I did not.
“[Prosecutor]: Okay, so the only person that you knew in this was Charles Jackson, your brother?
“[Goode]: That’s right.
“[Prosecutor]: And you called 911 shortly before lunchtime on December 25, 2001; is that correct?
“[Goode]: Yes, sir.”
(R. 1121-23.) Goode then testified that she did not identify herself during the 911 call because her husband was dying of cancer and she did not want to be involved.
“ ‘Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.” Rule 801(c), Ala.R.Evid.
We do not read Goode’s testimony as being offered for the truth of any matters asserted. Rather, we read her testimony to explain why she telephoned the authorities. It is well settled that the hearsay rule “ ‘ “does not exclude extrajudicial utterances offered merely to prove the fact of the making or delivery thereof, or to explain subsequent conduct of a hearer.” ’ Ashford v. State, 472 So.2d 717, 719 (Ala.Crim.App.1985), quoting 22A C.J.S. Criminal Law § 718 (1961).” Robitaille v. State, 971 So.2d at 57 (Ala.Crim.App.2005). See also Stallworth v. State, 868 So.2d 1128 (Ala.Crim.App.2001). Thus, the testimony was not inadmissible hearsay evidence.
Brownfield also avers that in the context of the evidence — i.e., Farmer’s earlier testimony that Brownfield had confessed to her and that she had telephoned her boyfriend Jackson and told him of Brownfield’s confession, coupled with Goode’s testimony that Jackson was her brother— Goode’s testimony had the effect of “ ‘repeating definite complaints of a particular crime by the accused, [that were] so likely to be misused by the jury as evidence of the fact asserted that it should [have been] excluded as hearsay.’ ” (Brownfield’s brief at p. 45, quoting Moseley v. State, 570 So.2d 719, 721 (Ala.Crim.App.1990).) However, we note that at no point did Goode testify that Brownfield was involved in the killings, i.e., she did not identify the killer as anyone other than “this guy.”
Moreover, even if the complained-of testimony was inadmissible hearsay, we would find no reversible error.
“ 1 “[Testimony that may be inadmissible may be rendered harmless by prior or subsequent lawful testimony to the same effect or from which the same facts can be inferred.” White v. State, 650 So.2d 538, 541 (Ala.Cr.App.1994), overruled on other grounds, Ex parte *21 Rivers, 669 So.2d 239 (Ala.Cr.App. 1995).... “The erroneous admission of evidence that is merely cumulative is harmless error.” Dawson v. State, 675 So.2d 897, 900 (Ala.Cr.App.1995).’ ”
Gavin v. State, 891 So.2d 907, 970 (Ala. Crim.App.2003), quoting Flynn v. State, 745 So.2d 295, 307 (Ala.Crim.App.1999). See also McNair v. State, 706 So.2d 828, 851 (Ala.Crim.App.1997). Farmer’s telephone call to Jackson telling him of Brownfield’s alleged actions and confession was already before the jury through previous testimony. So, too, was testimony that a caller had telephoned the police and alerted them to the presence of two bodies in the residence — Duncan testified that such a call had been made and the 911 operator’s dispatch log had been entered into evidence. Thus, those facets of Goode’s testimony, even if inadmissible, were rendered harmless by earlier testimony to the same effect.
As to the lone remaining aspect of her testimony, i.e., that Jackson told her that Farmer had told him about the bodies, that detail was clearly harmless in light of the evidence presented at trial. It was undisputed that the police had already begun investigating the case upon the discovery of Latham’s body sometime before Goode’s call to the police. Additionally, there was an abundance of evidence that Brownfield confessed repeatedly to committing the crimes, both to Farmer and to law-enforcement officials upon his arrest and in subsequent interrogations. Therefore, even if the admission of Goode’s testimony was error, it was harmless. See, e.g., Stallworth v. State, 868 So.2d 1128 (Ala.Crim.App.2001). See also Rule 45, Ala.R.App.P.[8]
D.
Brownfield further contends that the trial court improperly prevented him from introducing the full text of statements made by a deceased individual after the State had first introduced part of that statement.
The State played for the jury a videotape of Brownfield’s confession to the police. In that video, an investigator told Brownfield that “a couple of witnesses” or “some folks” claimed to have seen Brownfield at the Wallace Lane residence; the officer then stopped mid-sentence and asked whether Brownfield remembered having to have his automobile jump-started. Brownfield responded that “that was before” and that that had occurred on “Sunday morning” and that he had not gone back to the Wallace Lane residence after committing the acts.[9] According to Brownfield, the prosecutor also elicited testimony at trial indicating that Brownfield was seen taking, and later in possession of, a 1985 white Chrysler automobile. This, Brownfield contends, provided an inference that Brownfield was the person the witness claimed to have seen at the Wallace Lane residence on December 24. According to Brownfield, the witness, who was not identified on the videotape, was Charles Erskin Smith, whom police had interviewed on December 25 and December 26. However, Smith had since died and was thus unavailable to testify at trial. *22 Brownfield claims that the remainder of Smith’s statement included a description of the person Smith claimed to have seen and that that description did not match Brownfield. We note the following excerpt from the transcript:
“[Defense counsel]: Judge, our argument is that what they did on the videotape is they asked a question, which in that question it says that they had a witness that saw somebody driving an '85 white Chrysler at the scene on the 24th at Wallace Lane. And, of course, the inference was that it was Ben. And on the videotape, Ben denied that and said that that happened but it happened the day before. And our information is that that witness has now died, and, of course, that would normally be hearsay. But we want to make the argument that they have essentially introduced part of that statement, and we would like to introduce the rest of the statement. The statement of the description of the individual does not or is not consistent with Brownfield. You know, it’s a smaller individual and that’s what we want to introduce, and we think because they’ve been able to essentially introduce part of that statement, then we just want to introduce the rest of it.
“[Prosecutor]: Well, Judge, our position is that the defendant [sic] I think, is deceased, and I believe that is correct and that there is nothing in the rules of evidence or the law that permits that statement to come in or hearsay about that statement to comes in. And it does not fall within any of the exceptions to the rules.
“THE COURT: I would agree with that, but how do you address the fact that the question was asked in the statement or interrogation of the defendant?
“[Prosecutor]: Well, judge, I guess my answer to that would be that if that’s the case, then any information that officers use in the interrogation or in questioning witnesses would be subject to being brought in outside the hearsay rules which again I just don’t think the law says — well, the law says that hearsay can come in based on, you know, if it’s a dying declaration which there’s no contention that that’s here. But if there has been a court proceeding and there’s been testimony and the availability to cross-examine on that issue by the other party which we don’t have here, so I don’t know of any basis under the law that it would come in.
“[Defense counsel]: Well, we could put on the record that this is a denial of my client’s due process rights. The State is having its cake and eating it, too. They’re able to, through the videotape, introduce an inference that my client was there on 12/2⅛ and that someone saw him there. And now we’re being denied the right to cross-examine their knowledge about that. You know, they’re getting in what they want to get in, but the truth is according to the written statement — there’s two statements, and this is the only two-statement witness that I know of. Now, I could be wrong, but according to my files, this is the only two-statement witness, so this witness was very important to the State. And they went back — I believe Detective Petty went back — well, [Detective Shane] Clarke went first and then I believe Detective Petty went back. And I believe Detective Petty testified yesterday that he felt like that he needed to clarify, and I may be wrong as to exactly what he said, but it was something to that effect. But now we’re being precluded it appears. And we’re asking for the right to not be precluded from getting the information that rebuts their allegation and assertion to the jury. We need the jury to *23 hear the whole statement, and I didn’t research what rule that is that [the prosecutor] has referred to. But, first, it sounds good, but, secondly, I am familiar that there is some type of rule that addresses, you know, if a partial statement is introduced that the whole thing should come in. Now, for more of a better argument, it seems to me that just fairness and due process rights because the jury is going to be left with the inference that Mr. Brownfield was back there on 1212k, believe, around noon or whenever that took place according to the question through the video.
“THE COURT: But he denied that he was there that day, correct?
“[Defense counsel]: He did deny that.
“THE COURT: And he said that he was there but said that it happened the next day?
“[Defense counsel]: Well, the whole presumption of the video is that this man has done this and he’s involved and our story or the State’s story or the law enforcement’s story is what you believe. And there is direct evidence that rebuts that as there will be a lot of other evidence that rebuts it. But on this specific issue, we’re prevented from getting that in. And, again—
“THE COURT: Well, you've got it in that there was someone else reported at the residence on the 2j.th, and it wasn’t the defendant.
“[Defense counsel]: Well, I agree with Your Honor on that point absolutely, I agree. But what we’re not being able to get in, Your Honor, is the very description of this person, which is in no way the same person as Ben Brownfield according to the witness. And, again, the State has had every opportunity — well, I believe their objection here is that they will not have a right to cross-examine this witness who is now deceased. But they’re not the ones that took — well, I’m not saying [the prosecutors], but the State or the prosecution is the one that had the opportunity to at least two times talk to this witness. And if they needed to talk to him anymore, you know, either him or others to further corroborate his statements, then they have had the opportunity to do so. And it would be unfair and a denial of my client’s due process rights from being able to put this in and on that ground alone plus the ground that Gary argued.
“[Prosecutor]: Well, Judge. I believe the defense received a copy of that statement.
“[Defense counsel]: Your Honor, we’ll concede to that. You know, we’ve had that statement, and I don’t know exactly when we got it, but I’m not going to argue that the State has withheld that statement because—
“[Prosecutor]: Well, my point being is that they had an opportunity just as the State did to talk to that witness further. And it would not have changed the issue here in court if the witness has since deceased. But any further reference to that statement outside of the video in which the defendant denied being there that particular date was brought up in questioning by the defense attorneys not by the State.
“[Defense counsel]: And the fact that we had an opportunity to speak to him, I’m not denying. But I’m not seeing the relevance of that in the context of this argument. You know, if we had talked to him for three hours, then where does that put us in this argument because we would still be at the same place? And, again, we’re not disputing his statement at all. You know, whatever it says on its face is what we think the jury should hear.
*24 “THE COURT: Well, I still see it as hearsay, and I don’t see that there’s an exception to that rule.”
(R. 1289-93.) (Emphasis added.)
As the trial court noted, the defense elicited testimony refuting the inference alluded to in the videotape. On cross-examination of Investigator Hood, the following exchange occurred:
“[Defense counsel]: Now, are you aware of someone in the Scottsboro Police Department interviewing a gentleman on 12/24 — well, I’m sorry, that interviewed a gentleman sometime after 12/25 of 2001 that purportedly saw a male approximately 5'7" or 5'8" in height at Wallace Lane on or about 12:00 noon on 12/24?
“[Prosecutor]: Judge, I object to the hearsay.
“[Defense counsel]: Well, I just want to know if he’s aware of that.
“THE COURT: Overruled.
“[Investigator Hood]: I’m not aware— well, there was a number of witnesses that statements were taken from, but there was one guy that said that he [jump-started] a white car at Wallace Lane.
“[Defense counsel]: And was that along about noon on 12/24?
“[Investigator Hood]: I believe that’s right.
“[Defense counsel]: And that person did not fit the description of the defendant; is that your understanding?
“[Investigator Hood]: Well, Mr. Brownfield said that he remembered when he got [jump-started].
“[Defense counsel]: But the individual description of that man — now, I’m not asking you what my client said. I’m asking you, do you know what the witness is claiming?
“[Investigator Hood]: Well, I don’t know what his specific description was because I didn’t take that statement.”
(R. 1229-30.) Investigator Petty testified on cross-examination that he estimated Brownfield to be approximately six feet tall and to weigh approximately 230 pounds. The following exchange then occurred:
“[Defense counsel]: Now, you took a statement from a Mr. Charles Erskin Smith on 12/26; is that correct?
“[Investigator Petty]: Yes, sir.
“[Defense counsel]: Can you tell us about that statement and what led you to him, you know, to take a statement?
“[Prosecutor]: Judge, I would object to hearsay, you know, if he’s going into that statement
“[Defense counsel]: Well, I don’t think I’ve done that yet.
“THE COURT: Overruled.
“[Defense counsel]: Now, what led you to Mr. Smith?
“[Investigator Petty]: Well, he had already been interviewed earlier.
“[Defense counsel]: And do you know by whom?
“[Investigator Petty]: Detective Clarke, I believe.
“[Defense counsel]: Now, I’m Sorry, but do you have knowledge that Detective Clarke initially interviewed a Charles Erskin Smith?
“[Investigator Petty]: Yes, sir.
“[Defense counsel]: And then later, you went and interviewed him yourself; did you not?
“[Investigator Petty]: Yes, sir.
“[Defense counsel]: Why did you do that?
“[Investigator Petty]: I went to get a little more detail of what Mr. Smith had seen and done.
*25 “[Defense counsel]: Okay, but as a result of either one of these interviews, did that produce a lead related to this case? And we’ve talked about what a lead is—
“[Investigator Petty]: Yes, I understand what you’re saying, but he had mentioned a person that he had [jump-started] at the residence and he had given a height and weight—
“[Prosecutor]: Judge, I object to hearsay evidence being testified to.
“[Defense counsel]: Judge, I know [the prosecutor] is right, but may we approach on this because I think this is an issue that we need, to take up.
“THE COURT: Yes.
“[Defense counsel]: Judge, this gentleman, and I don’t believe I’ve asked him yet, but I believe he’s deceased. And at some point, we would like to in some way get in the record what these two interviews were about.
“THE COURT: I’m going to sustain at this time.”
(R. 1261-62.)
According to Brownfield, he should have been permitted to introduce Smith’s full statements to law enforcement, statements he contends constituted exculpatory hearsay to rebut the prosecution’s inculpatory hearsay, i.e., the reference by investigators during the interrogation that someone had seen someone in a white Chrysler automobile at the Wallace Lane residence on December 24. However, even assuming that Brownfield is correct and the defense should have been allowed to introduce the full text of the officers’ notes on Smith’s statements — and we make no such determination that error actually occurred— Brownfield would not be entitled to any relief because the error, if any, was harmless.
As the trial court noted, there was already evidence before the jury rebutting any inference that a witness saw Brownfield at the Wallace Lane residence on December 24.[10] On the videotaped interview with authorities, Brownfield denied returning to the residence at any time after the killings; instead, he stated that he had been there on the morning of December 23 needing to be jumped off to get the automobile started. Further, defense counsel’s cross-examination of Investigators Hood and Petty created the inference that the witness had given a description that did not match Brownfield’s height and weight. Additionally, we note that the defense later called Joy Watts, who testified that she lived next door to Brenda McCutchin at the time of the murders. Ms. Watts testified that around noon on December 24, 2001, a man came to her house asking if she had any jumper cables to jump-start his automobile — -according to Watts the automobile was parked at McCutchin’s house. Ms. Watts observed Brownfield in the courtroom and then stated that Brownfield was not the man who came to her front door asking for jumper cables.
In Houston v. State, 565 So.2d 277, 281 (Ala.Crim.App.1990), this Court stated that “[t]he exclusion of admissible evidence does not constitute reversible error where the evidence ‘would have been merely cumulative of other evidence of the same nature, which was admitted.’” Further, “[t]his is true even where the cumulative evidence which is excluded relative to the *26 defense being presented.” McLeod v. State, 581 So.2d 1144, 1153-54 (Ala.Crim.App.1990). We note that Brownfield relies on this Court’s opinion in Nettles v. State, 683 So.2d 9 (Ala.Crim.App.1996), to support his contention that he was entitled to introduce the statements in full. In Nettles, this Court acknowledged the rule set out in Houston, but concluded that the excluded evidence in Nettles was not cumulative to the evidence presented at trial in that the only evidence presented was Nettles’s own direct testimony. Thus, we held that the excluded evidence “ ‘lent a new aura of credibility,’ ” Nettles, 683 So.2d at 13. However, Brownfield’s reliance on Nettles is misplaced, in that here there was testimony other than Brownfield’s own denials during the interrogation to corroborate his denial that he was at the Wallace Lane residence on December 24. In addition to Brownfield’s statements during the videotaped interrogation, the jury was presented with Investigator Petty’s estimation of Brownfield’s weight and height, and with Ms. Watts’s testimony that Brownfield was not the man who came to her door at noon on December 24th and requested jumper cables and her testimony regarding that individual’s height, weight, and general appearance. Thus, because the excluded evidence was cumulative to other evidence properly before the jury, it is clear in this case that the trial court’s refusal to allow the defense to elicit hearsay evidence in the form of the statements of a deceased witness to law-enforcement officers investigating the murders was, if error at all, harmless error. See Rule 45, Ala.R.App.P. See also Smith v. State, 745 So.2d 922 (Ala.Crim.App.1999) (exclusion of witness was harmless error).
E.
Brownfield also contends that the trial court erred in allowing forensic scientist Nancie Jones to testify as an expert witness because, he claims, PCR DNA analysis was outside of her area of expertise.[11] Specifically, he argues that Jones had undertaken no coursework in human genetics; that she was not board-certified in any of the areas employed in PCR DNA analysis; and that her past involvement in published research was limited to methods of testing other than PCR DNA analysis.[12]
“‘Whether a witness is sufficiently qualified to testify as an expert is a question for the trial court to resolve in its discretion, and its ruling will not be disturbed on appeal unless it has abused that discretion.’ Smith v. State, 698 *27 So.2d 189, 205 (Ala.Crim.App.1996), aff'd, 698 So.2d 219 (Ala.1997). Moreover, ‘[i]t is for the jury to determine the weight and credibility of an expert witness’s testimony.’ Kilcrease v. John Deere Indus. Equip. Co., 663 So.2d 900, 902 (Ala.1995).”
Adams v. State, 955 So.2d 1037, 1089 (Ala.Crim.App.2003), rev’d in part, on other grounds, 955 So.2d 1106 (Ala.2005).
Here, Jones, a forensic scientist with the Alabama Department of Forensic Sciences, testified extensively as to her training and experience with DNA testing; as to the procedures employed by her laboratory during PCR DNA testing; and as to PCR DNA testing in general. She testified that she had been employed as a forensic scientist since 1994 and that she was formerly employed as a laboratory technician in what is now the forensic-biology section from 1988 until 1992. She stated that she had a bachelor of science degree from Athens State College and that she had completed graduate level course work at Alabama A & M University and the University of Alabama at Birmingham, including courses in genetics, molecular biology, biochemistry, and statistics. She testified that she had on-the-job training and had participated in workshops co-sponsored by the FBI and her laboratory to learn to perform PCR DNA analysis. She stated that she was a member of the American Academy of Forensic Sciences, a member of the Southern Association of Forensic Sciences, and a member of the Association of Forensic DNA Analysts and Administrators. She testified that she was the training officer for new forensic scientists hired by her department, having previously trained three forensic scientists and training a fourth. She stated that her laboratory undertakes technical and administrative reviews of their notes and reporting, and technical reviews of their DNA process; she further stated that she underwent proficiency testing at least twice a year to compare their own proficiency to that of other scientists at laboratories around the nation, and that she had never failed a proficiency test. She also testified as to the national certifications held by her laboratory, and described in detail the procedures employed by her laboratory in conducting DNA testing, including those employed during PCR DNA testing. She testified that although she did not hold a Ph.D. or board certification in any scientific disciplines, the Department of Forensic Sciences had no such requirements for forensic scientists. She testified that she conducted “probably hundreds” of DNA tests a year and that she had previously testified as an expert in DNA testing five or six times. (R. 1433.) Clearly, Jones’s testimony supported the trial court’s decision to allow her to testify as an expert witness. Having reviewed the record, we find no abuse of the trial court’s discretion in determining that Jones was qualified to testify as an expert on the State’s DNA evidence.
F.
Brownfield further claims that the trial court improperly allowed Dr. Melissa Clinger, Brownfield’s court-appointed psychologist, to testify during the guilt phase of his trial about information he had provided her during her mental examination of Brownfield.
“The general rule is that by actively pursuing an insanity defense and by introducing testimony of qualified psychologists or psychiatrists as defense witnesses, the defendant waives any potential psychotherapist-patient privilege or privilege against self-incrimination against subsequent qualified testimony or rebuttal. Ex parte Day, 378 So.2d 1159 (Ala.1979); Salmon v. State, 460 So.2d 334 (Ala.Cr.App.1984); Magwood *28 v. State, 426 So.2d 918 (Ala.Cr.App.1982).
“Fifth Amendment problems may arise, however, when an examining psychiatrist or psychologist is allowed to give testimony based upon conversations with a criminal defendant. Rule 11.2(b), Ala.R.Cr.P., addresses this problem by limiting such testimony to the mental condition of the accused.”
Williams v. State, 710 So.2d 1276, 1299 (Ala.Crim.App.1996). Rule 11.2(b), Ala. R.Crim.P., provides for the admissibility of mental examinations, as follows:
“(1) The results of examinations conducted pursuant to subsection (a)(1) of this rule, Rule 11.3, or Rule 11.4 on the defendant’s mental competency to stand trial shall not be admissible as evidence in a trial for the offense charged and shall not prejudice the defendant in entering a plea of not guilty by reason of mental disease or defect.
“(2) The results of mental examinations made pursuant to subsection (a)(2) of this rule and the results of similar examinations regarding the defendant’s mental condition at the time of the offense conducted pursuant to Rule 11.4 shall be admissible in evidence on the issue of the defendant’s mental condition at the time of the offense only if the defendant has not subsequently withdrawn his or her plea of not guilty by reason of mental disease or defect. Whether the examination is conducted with or without the defendant’s consent, no statement made by the defendant during the course of the examination, no testimony by an examining psychiatrist or psychologist based upon such a statement, and no other evidence directly derived from the defendant’s statement shall be admitted against the defendant in any criminal proceeding, except on an issue respecting mental condition on which the defendant has testified.”
Before trial, Brownfield underwent a court-ordered evaluation administered by Dr. Clinger in August 2002 to determine Brownfield’s competency to stand trial and his mental state at the time of commission of the offenses. Dr. Clinger’s forensic evaluation report contains the following:
“Prior to beginning the interview, the defendant was informed as to the purpose of the evaluation and limited confidentiality of the information to be obtained. He was told the results will be submitted in the form of a report to the Court, the defense attorney, and the District Attorney. He was also informed that these results may be used in court proceedings either through testimony of the examiner and/or the written report, to assist reaching decisions regarding his competency to stand trial and his mental state at the time of the alleged offense, but that none of the information could be used as evidence against him concerning his guilt on any charge. An explanation that this information might be used during the penalty phase as aggravating or mitigating factors was added. Mr. Brownfield indicated he understood the purpose and limited confidentiality of the evaluation, and he reviewed and signed a written notification form indicating his willingness to proceed with the interview.”
(C. 115.)
At the onset of the guilt phase of the trial, defense counsel confirmed that Brownfield was proceeding under his pleas of not guilty and not guilty by reason of mental disease or defect. (R. 768.) Throughout his opening statements, defense counsel repeatedly stated that the murders were the result of Brownfield’s addiction to methamphetamine. Defense counsel stated, among other many com *29 ments: “This is a case about death by meth.” (C. 776); ‘You will hear evidence that my client was totally submissive to the drug, meth, and that his brain was basically fried and that he had very, very little cognitive ability to do anything.” (C. 777); “[M]y client suffered from amnesia and confusion.” (R. 777-78); and “ [Yjou’re going to hear testimony of what it means to falsely confess; and you’re going to hear evidence of what a false memory is. You will hear evidence from a psychiatrist that these conditions exist in this case.” (R. 778.)
Throughout the State’s case during the guilt phase of the trial, Brownfield clearly attempted to elicit evidence challenging his mental status at the time of the offenses, i.e., attempting to show that the murders were committed while he was under the influence of Xanax and crystal methamphetamine.
During the defense’s case, Dr. Roger Lacy testified as an expert for the defense; he testified that he had examined the videotaped confessions, the police reports, Dr. Clinger’s report, and the report prepared by Dr. Joseph Embry of the Alabama Department of Forensic Sciences, and had interviewed Brownfield. According to Dr. Lacy, at the time of the murders, Brownfield was “confused, he was in a drug soup.” (R. 1736.) Dr. Lacy further testified that at the time he purportedly waived his Miranda rights, Brownfield was “like a two-year-old, you know, being confused and befuddled, delirium.” (R. 1737.) Finally, Dr. Lacy stated that, at the time he made the confessions, Brownfield’s mental status was “confused with gradual changing from about a two-year-old at the beginning to maybe the level of about a ten-year-old at best at the end.” (R. 1737.) He further stated that Brownfield’s statements were involuntary and that Brownfield could not have made a knowing, voluntary, or intelligent statement. Dr. Lacy further testified that Brownfield was unable to remember anything from the interrogations. According to Dr. Lacy, Brownfield, because of his mental state as a result of his drug ingestion, was in a highly suggestive state and assimilated information and details relayed to him during the interrogations as his own memories, an occurrence Dr. Lacy characterized as a “false memory.” Dr. Lacy stated that Brownfield, at the time of the confessions, would not have been able to recognize that he was a suspect, would not have recognized the severity of the legal implications of what he was saying, would not have recognized the police investigators as adversaries, and would not have been able to recognize or understand his rights. Dr. Lacy further stated that at the time of the murders, Brownfield was in a state of delirium and would not have understood or accurately interpreted the events taking place around him.
At the conclusion of the defense’s case, the State called Dr. Clinger as a rebuttal witness. Dr. Clinger testified without objection that she had examined Brownfield to determine his sanity at the time of the offenses; she stated that she gathered information from the district attorney’s office and from defense counsel and had met with Brownfield twice for a total of approximately four or five hours. When asked what information she used to diagnose Brownfield, defense counsel objected and requested a sidebar, at which time a bench conference was held off the record. Upon the conclusion of that bench conference, Dr. Clinger testified without objection that her goal was to evaluate Brownfield and to assess his treatment needs, if any. She stated that she performed a diagnostic clinical interview and administered an IQ test; she testified without objection as to her conclusions regarding his intellectual status and mental ability. *30 Dr. Clinger testified that Brownfield was able to recall and repeat information to her, including arithmetic problems she posed to him, his educational background, and his work history. The following exchange then occurred:
“[Prosecutor]: All right; did he have any memory at all as to his activities on December 23, 24 and 25?
“[Dr. Clinger]: He was able to provide me with an account of what he was doing during most of that time.
“[Prosecutor]: All right; was he able to recall getting into a verbal dispute with his sister on the 23rd?
“[Dr. Clinger]: Yes.
“[Prosecutor]: And what details was he able to provide regarding that?
“[Dr. Clinger]: Well, it was something about—
“[Defense counsel]: Judge, I object again. That goes to the very issue that I was informing you about. And that has nothing to do with this test or his assessment, and I would object.
[[Image here]]
“(JURY NOT PRESENT.)
“THE COURT: All right; do you want to state your objection?
“[Defense counsel]: Well, Judge, what I’m concerned about is the very front page of the forensic evaluation report prepared by Dr. Clinger, she says, and I will just read it, ‘Ben Brownfield was also informed that these results may be used in court proceedings either through testimony of the examiner and/or the written report to assist reaching decisions regarding his competency to stand trial and his mental state at the time of the alleged offense but that none of the information could be used as evidence against him concerning his guilt on any charge.’ Now, my objection is that this questioning, and where I believe the assistant district attorney was going with that is to get into the facts of what Mr. Brownfield has described to Dr. Melissa Clinger. And just because the court gives some kind of limiting instruction at some point that they are not to consider any of this in their determination of guilt[, it] is still highly prejudicial and will violate his rights, Your Honor — his due process rights because he was told that none of this could be used, and none of this information could be used as evidence against him. And this is a way to circumvent that by getting into the details of what he told her.
“THE COURT: Well, he has raised the issue of insanity at the time of the alleged offense, and the law is very clear that any statements that he gives to the psychologist would be admissible on that issue.
“[Defense counsel]: Well, there is no issue of insanity, and we withdraw any claim that he was insane. And we will put that on the record.
“[Prosecutor]: Judge, we would consider that to be untimely made, and they’ve already introduced evidence from their expert on his inability to recall the details. And if it’s not admissible on his mental state at the time, it certainly is to impeach Dr. Lacy’s testimony about him having no memory whatsoever of these events.
“[Defense counsel]: We are not arguing that he was legally insane. That’s the term that I’m talking about, legal insanity. And nothing that we have put on or attempted to argue goes to legal insanity.
“[Prosecutor]: Well, Your Honor, that was one of the questions that we asked before we got started if he was maintaining that plea and [defense counsel] stated clearly, yes, [he] was.
*31 “[Defense counsel]: Well, we have not put on any evidence to that effect.
“[Prosecutor]: And in fact I think he requested an instruction to that effect.
“[Defense counsel]: Well, that doesn’t mean that we’re going that route.
“THE COURT: Well, I asked specifically so that this issue could be addressed at the very beginning, and you told me that you definitely intended to pursue that plea of not guilty by reason of mental disease or defect. And you put on your psychiatrist.
“[Defense counsel]: Well, Your Hon- or, we said that we were not contesting his sanity at trial or his competency at trial. And that’s what I recall telling the court that that was not going to be an issue.
“THE COURT: Right, because that issue had already been decided by the court because it had not been made an issue previously and there had been no request for a hearing on the issue of whether he was competent to stand trial.
“[Defense counsel]: Well, our position now is that we’re not arguing any insanity-
“THE COURT: Well, I think it’s too late. I think the door has been opened because there’s been questions asked of your psychiatrist regarding that plea. So I’m going to permit her to testify. But any statements that he made to you, you can relate, you know, if they had a bearing on your assessment of his mental state at the time of the alleged offense. Otherwise, they should not be admissible in this hearing. Do you understand?
“[Dr. Clinger]: Well, Your Honor, I didn’t ask if he did it or not, and he didn’t tell me if he did it or not.
“THE COURT: All right; so that should take care of that.
“[Defense counsel]: Well, Judge, is the court saying that we asked our witnesses questions concerning whether the defendant was legally insane?
“THE COURT: I’m saying that questions were asked and at no time was there an objection made to those questions. And I know the psychiatrist was asked if he was suffering from a mental disease or defect, and—
“[Defense counsel]: Yes, that was asked.
“THE COURT: Right, and there was no objection made as if you had withdrawn that plea.
“[Defense counsel]: Okay, I see the court’s point.
“THE COURT: All right; let’s recess for lunch.”
(R. 1959-63.)
Dr. Clinger then testified that Brownfield informed her that he was unhappy with his sister because on December 23, 2001, he had given her some money that she was supposed to have used to obtain drugs. Dr. Clinger testified with regard to the events of December 24 that Brownfield recalled taking a shower at Farmer’s residence and riding around with his friend Nick Logan and that he told Farmer what he had done. As for Brownfield’s recollection of the events on December 25, Dr. Clinger testified that Brownfield told her that he remembered the officers advising him of his Miranda rights. According to Dr. Clinger, she saw no indication that Brownfield suffered from a severe mental disease or defect “ever or during the time of the alleged offense.” (R. 1965.) She stated that she “thought [Brownfield] had no significant impairment as far as mental illness or cognitive deficits or problems in thinking that would have interfered with his ability to appreciate the wrongfulness of his acts and the consequences.” (R. 1966.) On cross-examination, Dr. Clinger *32 was questioned extensively about false memories. She was further questioned about Brownfield’s assertions to her that he had ingested Xanax and crystal methamphetamine at times prior to the murders and the possibility that those narcotics may have affected his memory.
Initially, we question whether this claim was properly preserved for appellate review, in that a substantial amount of testimony was elicited before defense counsel’s initial objection. Further, the grounds of that objection, any response from the prosecutor, and any remarks by the trial court were not transcribed for the record.
However, for the reasons that follow, we find no error, plain or otherwise, in the trial court’s decision to allow the complained-of testimony.
Here, much of Brownfield’s opening statement was devoted to the effects narcotics played in the murders in an attempt to portray Brownfield as a victim who had been abandoned by society. Further, Brownfield repeatedly targeted the volun-tariness of his statements to the police and the rationality of his actions, both on cross-examination of the State’s witnesses and in his presentation of expert testimony, to his assertion that he was under the influence of Xanax and methamphetamine at the time of the murders and at the time of his confessions. That he purported to withdraw his plea of not guilty by reason of mental disease or defect did not close the door that he had already opened. As this Court stated in Lee v. State, 898 So.2d 790 (Ala.Crim.App.2001) (opinion on return to remand):
“Even though the appellant ostensibly abandoned his plea that he was not guilty by reason of mental disease or defect, he clearly based his defense on a contention that there was something wrong with his mental condition. Therefore, Dr. Ronan’s testimony about the results of her mental examination was admissible to refute his defense that there was something wrong with him, to rebut Dr. Blanton’s testimony that he was psychotic and mentally retarded, and to explain the inconsistencies between her conclusions and Dr. Blanton’s conclusions. Furthermore, even if the appellant was not advised of his Miranda rights and was not told that his statements could be used against him, Dr. Ronan’s testimony about statements the appellant made was admissible pursuant to Rule 11.2(b)(2), Ala.R.Crim.P., because those statements were relevant and material to support her conclusion that he did not suffer from any mental disease or defect and that he was not mentally retarded. See Williams v. State, 710 So.2d 1276, 1299-1300 (Ala.Crim.App.1996), aff'd, 710 So.2d 1350 (Ala.1997). Finally, the record does not support the assertion that the State was trying to use Dr. Ronan’s testimony to malign the appellant’s character. Rather, it shows that the State used the testimony to rebut Dr. Blanton’s testimony and to explain the inconsistencies between his conclusions and her conclusions. Therefore, we do not find that there was any plain error in this regard.”
The reasons set forth in Lee are equally applicable here. The evidence was properly admitted to rebut both Dr. Lacy’s testimony during the defense’s case, and, to some degree, the testimony elicited by the defense’s questioning of other witnesses attempting to portray Brownfield as unable to recall the events or to speak voluntarily with authorities. Therefore, we find no error, plain or otherwise, in the trial court’s allowance of Dr. Clinger’s testimo-ny.
G.
Brownfield also argues that the cumulative effect of the trial court’s errors man *33 dates a new trial. Although he does not specify what errors he is referring to, we note that this claim was advanced as a subpart of his assorted evidentiary claims addressed in Part I of this opinion; thus, we construe his argument to be limited to the claims addressed in Part I.
As the Alabama Supreme Court has so succinctly stated, the cumulative-error rule is as follows: “[W]hile, under the facts of a particular case, no single error among multiple errors may be sufficiently prejudicial to require reversal under Rule 45, if the accumulated errors have ‘probably injuriously affected substantial rights of the parties,’ then the cumulative effect of the errors may require reversal.” Ex parte Woods, 789 So.2d 941, 942 n. 1 (Ala.2001) (quoting Rule 45, Ala.R.App.P.). Applying this standard, we have considered these allegations of error cumulatively, and we do not find that Brownfield’s substantial rights have probably been injuriously affected.
II.
Brownfield next argues that the trial court erred in denying his challenges for cause of prospective jurors J.C., A.M., H.P., and D.W. Specifically, Brownfield contends that his challenges for cause of prospective jurors J.C., A.M., and H.P. were improperly denied because those prospective jurors initially indicated in response to general questions posed during voir dire that they would always vote to impose the death penalty for certain convictions. He also argues that prospective juror J.C. failed to affirmatively indicate, in response to a question posed during voir dire, whether he felt that a sentence of life imprisonment without parole was a serious sentence. He specifically contends that his challenge for cause of prospective juror D.W. should have been granted based on D.W.’s initial denial that she did not know one of the victims granddaughters.
As the Alabama Supreme Court explained in Bethea v. Springhill Memorial Hospital, 833 So.2d 1 (Ala.2002), error in the trial court’s refusal to remove a prospective juror for cause is subject to the harmless-error analysis:
“The application of a ‘harmless-error’ analysis to a trial court’s refusal to strike a juror for cause is not new to this Court; in fact, such an analysis was adopted as early as 1909:
“ ‘The appellant was convicted of the crime of murder in the second degree. While it was error to refuse to allow the defendant to challenge the juror C.S. Rhodes for cause, because of his having been on the jury which had tried another person jointly indicted with the defendant, yet it was error without injury, as the record shows that the defendant challenged said juror peremptorily, and that, when the jury was formed the defendant had not exhausted his right to peremptory challenges.’
“Turner v. State, 160 Ala. 55, 57, 49 So. 304, 305 (1909). However, in Swain v. Alabama, 380 U.S. 202, 219, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), overruled on other grounds, Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the United States Supreme Court stated, in dicta, that ‘[t]he denial or impairment of the right is reversible error rvithout a showing of prejudice.’ (Emphasis added [in Bethea].) Some decisions of this Court as well as of the Alabama Court of Criminal Appeals reflect an adoption of this reasoning. See Dixon v. Hardey, 591 So.2d 3 (Ala.1991); Knop v. McCain, 561 So.2d 229 (Ala. 1989); Ex parte Rutledge, 523 So.2d 1118 (Ala.1988); Ex parte Beam, 512 So.2d 723 (Ala.1987); Uptain v. State, *34 534 So.2d 686, 688 (Ala.Crim.App.1988) (quoting Swain and citing Beam and Rutledge); Mason v. State, 536 So.2d 127, 129 (Ala.Crim.App.1988) (quoting Uptain).
“... [T]his Court has returned to the ‘harmless-error’ analysis articulated in the Ross v. Oklahoma, 487 U.S. 81, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988), and [United States v.] Martinez-Salazar, 528 U.S. 304, 120 S.Ct. 774, 145 L.Ed.2d 792 (2000), decisions. Because a defendant has no right to a perfect jury or a jury of his or her choice, but rather only to an ‘impartial’ jury, see Ala. Const. 1901 § 6, we find the harmless-error analysis to be the proper method of assuring the recognition of that right.
“In this instance, even if the Betheas could demonstrate that the trial court erred in not granting their request that L.A.C. be removed from the venire for cause (an issue we do not reach), they would need to show that its ruling somehow injured them by leaving them with a less-than-impartial jury. The Betheas do not proffer any evidence indicating that the jury that was eventually impaneled to hear this action was biased or partial. Therefore, the Betheas are not entitled to a new trial on this basis.”
833 So.2d at 6-7 (footnotes omitted). See also Calhoun v. State, 932 So.2d 923 (Ala.Crim.App.2005). Here, as in Bethea, Brownfield has offered no evidence that the jury ultimately impaneled was biased. Brownfield concedes in his brief that he exercised a peremptory challenge to remove D.W. from the venire, and it is apparent from the record that prospective jurors J.C., A.M., and H.P. were not selected to serve on the jury empaneled to hear the case. Therefore, even if the trial court’s refusal to remove the complained-of veniremembers for cause was error, the error was harmless.
Moreover, we note with regard to prospective jurors J.C., A.M., and H.P., that “[j]urors who give responses that would support a challenge for cause may be rehabilitated by subsequent questioning by the prosecutor or the court.” Johnson v. State, 820 So.2d 842, 855 (Ala.Crim.App.2000). “The crucial inquiry is whether the veniremen could follow the court’s instructions and obey his oath, notwithstanding his views on capital punishment.” McNabb v. State, 887 So.2d 929, 944 (Ala. Crim.App.2001), quoting other cases. Here, although each of the three complained-of prospective jurors gave initial responses during voir dire indicating strong support in the application of the death penalty, each also indicated that they could set aside any predetermined feelings about the death penalty and follow the trial court’s instructions. Therefore, there was no error in the trial court’s refusal to remove prospective jurors J.C., A.M., and H.P. for cause.
Admittedly, the questions surrounding prospective juror D.W. raise a closer question in that there was some question as to whether a child of D.W.’s brother was Latham McCutchin’s granddaughter. We note the following individual voir dire:
“THE COURT: [D.W.], I had some questions that I wanted to ask you. One of the potential witnesses in this case saw your name and thought that you might be related to [T.C.] who is La-tham McCutchin’s daughter. And I believe the relationship would be that this potential witness thought that you might be the aunt of [T.C.J’s daughter; is that correct?
“PROSPECTIVE JUROR [D.W.]: The only [T] that I know is a [T] that was with my brother when they were in high school, and they did have a child together. But I don’t have anything to *35 do with her, you know, I just know her on a first name basis. And, you know, I don’t know her last name, and I don’t know the mother.
“THE COURT: So you could be the aunt of [T.C.]’s child; is that correct?
“PROSPECTIVE JUROR [D.W.]: Yes.
“THE COURT: But you don’t know her or the child?
“PROSPECTIVE JUROR [D.W.]: No.
“THE COURT: Now, the fact that your niece, I guess it would be the granddaughter of one of the alleged victims, Mr. Latham McCutchin, would that have any impact on your verdict in this case?
“PROSPECTIVE JUROR [D.W.]: No, because I have no idea of who it is.
“THE COURT: And the fact that there would be some relationship, that would have no effect whatsoever?
“PROSPECTIVE JUROR [D.W.]: Well, I don’t know them. So if I never knew them, how could I hold them accountable? You know, it’s like — ■
“THE COURT: Well, it would be in this case that you might have more sympathy towards them because you have some connection with the family.
“PROSPECTIVE JUROR [D.W.]: I can’t have any sympathy towards anybody that I don’t know.
“THE COURT: All right; thank you. Do y’all have any questions?
“[Defense counsel]: No.
“[Prosecutor]: I think you were asked about the names, [R.M.] and [T.C.], and you don’t know either of those people?
“PROSPECTIVE JUROR [D.W.]: Not on a personal basis, you know, I know of them. You know, like, I don’t know the McCutchins at all, and the only one I know is the daughter that is possibly my brother’s child.
“[Prosecutor]: And what is that daughter’s name?
“PROSPECTIVE JUROR [D.W.]: [R], and I only know her on a first name basis, and I’ve only seen her, like, three times. And I don’t know her birthday, and I don’t know how old she is.
“[Prosecutor]: That’s all.
“THE COURT: Was paternity ever established?
“PROSPECTIVE JUROR [D.W.]: I really don’t know.
“THE COURT: So your brother was not married to [T.C.]?
“PROSPECTIVE JUROR [D.W.]: No, it was just a fling, you know, something that happened during high school. And it was possible, but I don’t know anything for sure, and I don’t know anything about it.”
(R. 722-24.)
Thus, although Brownfield exercised a peremptory strike to remove D.W. from the venire, it is clear from the following exchange that this was not the type of close familial relationship that normally gives rise to concerns about partiality. The trial court thoroughly questioned the prospective juror about her possible relationship with the victim and his family and determined that the challenge for cause was due to be denied. We agree with the trial court.
For these reasons, Brownfield is not entitled to any relief on this claim.
III.
Brownfield next argues that Alabama’s statutory capital-sentencing scheme is constitutionally infirm for two reasons: (1) that pursuant to Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), the jury, and not the trial judge, *36 must make the determination as to whether the aggravating circumstances outweigh the mitigating circumstances; and (2) that the jury’s recommendation of death must be unanimous.
With regard to Brownfield’s contention that the jury, rather than the trial court, should weigh the mitigating circumstances against the aggravating circumstances, we note that nothing in Ring requires such an approach. Rather, in a number of opinions decided in the aftermath of Ring, both this Court and the Alabama Supreme Court have concluded that Ring did not invalidate Alabama’s death-penalty statute, a statute that vests the ultimate sentence determination in the hands of the trial judge and not the jury. See, e.g., Ex parte Hodges, 856 So.2d 936 (Ala.2003); Ex parte Waldrop, 859 So.2d 1181 (Ala.2002); Duke v. State, 889 So.2d 1, 41 (Ala.Crim.App.2002) (opinion on return to remand), cert. granted, sentence of death vacated pursuant to Roper v. Simmons, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005), Duke v. Alabama, 544 U.S. 901, 125 S.Ct. 1588, 161 L.Ed.2d 270 (2005); Turner v. State, 924 So.2d 737 (Ala.Crim.App.2002); Stallworth v. State, 868 So.2d 1128, 1178 (Ala.Crim.App.2001) (opinion on return to second remand). In recognizing the narrowness of the United States Supreme Court’s holding in Ring, this Court has noted that although “[t]he Ring Court held that any aggravating circumstance that increased a sentence to death must be proved to a jury beyond a reasonable doubt,” the Ring Court “did not reach the question whether judicial sentencing or judicial override was constitutional.” Stallworth v. State, 868 So.2d at 1183 (opinion on return to second remand). Further:
“ ‘Ring’s claim is tightly delineated: He contends only that the Sixth Amendment required jury findings on the aggravating circumstances asserted against him. No aggravating circumstance related to past convictions in his case; Ring therefore does not challenge Almendarez-Torres v. United States, 523 U.S. 224, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998), which held that the fact of prior conviction may be found by the judge even if it increases the statutory maximum sentence. He makes no Sixth Amendment claim with respect to mitigating circumstances. See Apprendi v. New Jersey, 530 U.S. 466, 490-91, n. 16, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) (noting “the distinction the Court has often recognized between facts in aggravation of punishment and facts in mitigation” (citation omitted [in Ring ])). Nor does he argue that the Sixth Amendment required the jury to make the ultimate determination whether to impose the death penalty. See Proffitt v. Florida, 428 U.S. 242, 252, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976) (plurality opinion) (“[I]t has never [been] suggested that jury sentencing is constitutionally required.”). He does not question the Arizona Supreme Court’s authority to reweigh the aggravating and mitigating circumstances after that court struck one aggravator. See Clemons v. Mississippi, 494 U.S. 738, 745, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990). Finally, Ring does not contend that his indictment was constitutionally defective. See Apprendi, 530 U.S., at 477, n. 3, 120 S.Ct. 2348, 147 L.Ed.2d 435 (Fourteenth Amendment “has not ... been construed to include the Fifth Amendment right to ‘presentment or indictment of a Grand Jury’ ”).’ ”
Stallworth v. State, 868 So.2d at 1183-84 (quoting Ring, 536 U.S. at 597 n. 4, 122 S.Ct. 2428).
As the Alabama Supreme Court stated in Ex parte Waldrop:
*37 “[T]he weighing process is not a factual determination. In fact, the relative ‘weight’ of aggravating circumstances and mitigating circumstances is not susceptible to any quantum of proof. As the United States Court of Appeals for the Eleventh Circuit noted, ‘While the existence of an aggravating or mitigating circumstance is a fact susceptible to proof under a reasonable doubt or preponderance standard ... the relative weight is not.’ Ford v. Strickland, 696 F.2d 804, 818 (11th Cir.1983). This is because weighing the aggravating circumstances and the mitigating circumstances is a process in which ‘the sen-tencer determines whether a defendant eligible for the death penalty should in fact receive that sentence.’ Tuilaepa v. California, 512 U.S. 967, 972, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994). Moreover, the Supreme Court has held that the sentencer in a capital case need not even be instructed as to how to weigh particular facts when making a sentencing decision. See Harris v. Alabama, 513 U.S. 504, 512, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995) (rejecting ‘the notion that “a specific method for balancing mitigating and aggravating factors in a capital sentencing proceeding is constitutionally required” ’ (quoting Franklin v. Lynaugh, 487 U.S. 164, 179, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988)) and holding that ‘the Constitution does not require a State to ascribe any specific weight to particular factors, either in aggravation or mitigation, to be considered by the sentencer’).
“Thus, the weighing process is not a factual determination or an element of an offense; instead, it is a moral or legal judgment that takes into account a theoretically limitless set of facts and that cannot be reduced to a scientific formula or the discovery of a discrete, observable datum. See California v. Ramos, 463 U.S. 992, 1008, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983) (‘Once the jury finds that the defendant falls within the legislatively defined category of persons eligible for the death penalty, ... the jury[ ] then is free to consider a myriad of factors to determine whether death is the appropriate punishment.’); Zant v. Stephens, 462 U.S. 862, 902, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983) (Rehnquist, J., concurring in the judgment) (‘sentencing decisions rest on a far-reaching inquiry into countless facts and circumstances and not on the type of proof of particular elements that returning a conviction does’).
“In Ford v. Strickland, supra, the defendant claimed that ‘the crime of capital murder in Florida includes the element of mitigating 'circumstances not outweighing aggravating circumstances and that the capital sentencing proceeding in Florida involves new findings of fact significantly affecting punishment.’ Ford, 696 F.2d at 817. The United States Court of Appeals for the Eleventh Circuit rejected this argument, holding that ‘aggravating and mitigating circumstances are not facts or elements of the crime. Rather, they channel and restrict the sentencer’s discretion in a structured way after guilt has been fixed.’ 696 F.2d at 818. Furthermore, in addressing the defendant’s claim that the State must prove beyond a reasonable doubt that the aggravating circumstances outweighed the mitigating circumstances, the court stated that the defendant’s argument
“ ‘seriously confuses proof of facts and the weighing of facts in sentencing. While the existence of an aggravating or mitigating circumstance is a fact susceptible to proof under a reasonable doubt or preponderance standard, see State v. Dixon, 283 So.2d 1, *38 9 (Fla.1973), cert. denied, 416 U.S. 943, 94 S.Ct. [1950], 40 L.Ed.2d 295 (1974), and State v. Johnson, 298 N.C. 47, 257 S.E.2d 597, 617-18 (1979), the relative weight is not. The process of weighing circumstances is a matter for judge and jury, and, unlike facts, is not susceptible to proof by either party.’
“696 F.2d at 818. Alabama courts have adopted the Eleventh Circuit’s rationale. See Lawhorn v. State, 581 So.2d 1159, 1171 (Ala.Crim.App.1990) (“while the existence of an aggravating or mitigating circumstance is a fact susceptible to proof, the relative weight of each is not; the process of weighing, unlike facts, is not susceptible to proof by either party5); see also Melson v. State, 775 So.2d 857, 900-901 (Ala.Crim.App.1999); Morrison v. State, 500 So.2d 36, 45 (Ala.Crim.App.1985).
“Thus, the determination whether the aggravating circumstances outweigh the mitigating circumstances is not a finding of fact or an element of the offense. Consequently, Ring and Apprendi do not require that a jury weigh the aggravating circumstances and the mitigating circumstances.”
Ex parte Waldrop, 859 So.2d at 1189-1190 (footnote omitted).
Here, in returning guilty verdicts as to the charged capital offense of burglary-murder and the capital offense of the murder of two or more people during one act or pursuant to one scheme or course of conduct, the jury of necessity unanimously found that two statutory aggravating circumstances had been proven beyond a reasonable doubt, i.e., § 13A-5-49(3) and (4), Ala.Code 1975. See, e.g., Stallworth v. State, 868 So.2d 1128 (Ala.Crim.App.2001) (opinion on return to remand) (if the aggravating circumstance that elevated the punishment to death was also an element of the capital offense, Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), was not violated because the jury’s verdict in the guilt phase found that fact to exist beyond a reasonable doubt). See also Ex parte Waldrop, supra (jury conviction of the capital offense of murder-robbery satisfied the requirement that an aggravating circumstance be found by the jury and the verdict itself rendered the defendant death-eligible, exposing him to a range of punishment that included the death penalty). Thus, the limited mandates of Ring have been satisfied in this case, because the jury unanimously found at least one statutory aggravating circumstance, making Brownfield eligible for the death penalty. What relative weight to assign the aggravating circumstances and mitigating circumstances was for the trial court. See Ex parte Waldrop, 859 So.2d at 1190 (“the determination whether the aggravating circumstances outweigh the mitigating circumstances is not a finding of fact or an element of the offense. Consequently, Ring and Apprendi do not require that a jury weigh the aggravating circumstances and the mitigating circumstances.”). Therefore, Brownfield is not entitled to any relief on this claim.
With regard to Brownfield’s contention that the jury’s 11-1 advisory verdict in favor of the death penalty was not a “unanimous” verdict as set out in Rule 23.1(a), Ala. R.Crim.P., which states that the “verdict of the jury shall be unanimous, shall be in writing, signed by the foreman, and shall be returned in open court,” we note that the jury’s verdict as to the charged offenses was unanimous in this case. The 11-1 vote of the jury following the sentencing hearing recommending that Brownfield be sentenced to death for his commission of the charged offenses was merely an advisory sentencing verdict. It *39 is well settled that Alabama law allows for the jury to return an advisory verdict as to sentencing in capital-murder cases and that the jury may vote to recommend the death penalty by a vote of at least 10 jurors in favor of death (12-0, 11-1, or 10-2). Further, both this Court and the Alabama Supreme Court have upheld death sentences imposed after the jury made a nonunanimous recommendation that the defendant be sentenced to death. See, e.g., Ex parte McNabb, 887 So.2d 998, 1000 (Ala.2004) (jury recommended death by 10-2 vote); Stallworth v. State, 868 So.2d 1128, 1136 (Ala.Crim.App.2001) (jury recommended death by 10-2 vote); Irvin v. State 940 So.2d 331, 364-366 (Ala.Crim. App.2005) (jury recommended death by 10-2 vote). Accordingly, Brownfield’s argument is without merit.
IV.
Last, as required by § 13A-5-53, Ala. Code 1975, we review the propriety of Brownfield’s convictions and sentence of death. Brownfield was indicted for, and convicted of, murdering three-year-old Joshua Hodges, a violation of § 13A-5-40(a)(15), Ala.Code 1975; murdering La-tham McCutchin during the course of a burglary, a violation of § 13A-5^0(a)(4), Ala. Code 1975; and murdering Brenda McCutchin, Joshua Hodges, and Latham McCutchin, during one act or pursuant to one scheme or course of conduct, a violation of § 13A-5-40(a)(10), Ala.Code 1975.
The record reflects that Brownfield’s sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor. Section 13A-5-53(b)(l), Ala.Code 1975.
The trial court’s sentencing order reflects that, with regard to each capital-murder charge, the court found the existence of the aggravating circumstance that the murders were especially heinous, atrocious, or cruel:
“Under the pretext of a friendly visit, the defendant was allowed into Latham McCutehin’s home. Rather than a friendly visit, the defendant’s sole purpose of gaining entry into the home was to kill Latham McCutchin. Minutes after being invited into Latham’s home, the defendant informed Latham that he was going to kill him. Immediately, La-tham tried to defend himself from the defendant. He saw the defendant pull the claw hammer from his jacket and grabbed at it. During the struggle for the claw hammer, the defendant elbowed Latham and punched him several times with his fists. Dr. Embry testified that he observed a 6½ inch by ½ inch rib bruise on Latham’s lower chest. After punching Latham with his fists, the defendant began to hit Latham repeatedly with the claw hammer. La-tham suffered at least ten forceful blows to the head. He had numerous lacerations to his head and fractures on his skull. Dr. Embry described the lacerations as blunt-force injuries to the scalp. He said some injuries extended all the way to the bone and the bone was driven into the brain or displaced. He described one 3-inch-by-3-inch section of bone missing from Latham’s head. La-tham suffered defensive wounds to his arms and hands in an attempt to ward off the defendant’s blows. According to Dr. Embry, Latham suffered bruising to his forearm and hands. Latham also suffered fractured ribs and a fractured vertebra. Latham didn’t die instantly. According to Dr. Embry, the bleeding around the left kidney and blood in the bladder indicates that Latham survived for a period of time. The defendant stabbed Latham in the heart with a knife leaving a 1 ⅛ inch wound over the heart and extending into it. The defen *40 dant cut Latham’s throat with the knife from one side of his neck to the other. The defendant told investigators that he stabbed Latham in the chest and cut his throat because he kept breathing and making noises. He also told his girlfriend that ‘they don’t die instantly.’ Clearly, Latham McCutchin suffered intense pain for a significant period of time prior to his death. Additionally, Latham McCutchin suffered psychologically. The court can only imagine the intense fear that Latham must have felt when his brother-in-law told him that he was going to kill him. Latham was trapped in his own home having been awakened from sleep for the night. La-tham had no weapon to defend himself against the much younger and stronger defendant. He saw the defendant pull the claw hammer from his jacket and was helpless to prevent the attack on his life. The murder of Latham McCutchin was committed under circumstances that caused fear and pain to Latham before his death. Furthermore, while Latham lay dying or dead in his living room floor, the defendant wrote a message on a wall in the house. He wrote, ‘This was necessary Ben. I’m sorry for your family. They deserved it.’ Afterward, the defendant showered in the victim’s bathroom, gathered his blood-soiled clothes, the claw hammer, and knife, and left the residence to dispose of the evidence. The court finds that Latham’s murder was a conscienceless or pitiless crime and unnecessarily torturous to the victim. The court finds that the defendant’s brutality to Latham exceeds that which is normally present in a capital case.
“Brenda Whitehead McCutchin and her three-year-old grandson, Joshua Dewayne Hodges were murdered in their bed. Both Brenda and Joshua were asleep when the defendant first struck Brenda with a claw hammer. After the defendant hit Brenda with the claw hammer, Joshua woke up crying. At that point, the defendant began attacking both Brenda and Joshua with the claw hammer. Brenda tried to defend herself and/or Joshua. Dr. Embry testified that Brenda suffered lacerations to her face, injuries to her shoulder and right side of the body, broken jaw on both sides of the face, and broken left middle and ring fingers with extensive blunt-force injuries to the hands. Both Brenda and Joshua suffered fractured skulls. The defendant told his girlfriend that ‘they don’t die instantly.’ According to Dr. Embry, a person may live longer with a fractured skull because the brain can swell. One autopsy photograph shows Brenda’s herniated brain protruding from the skull. In addition to a fractured skull, Joshua suffered lacerations consuming a large area around the right eye. He suffered injuries to both sides of his face, the right side of his neck, and the upper torso. Perhaps in an attempt to ward off the blows, Joshua suffered a 1/4 inch cut to his right little finger. Ultimately Brenda and Joshua died from their injuries but not before each of them experienced intense pain from the savage beatings. Brenda suffered approximately twenty forceful blows to her head. Joshua suffered approximately sixteen forceful blows to his head. As did Latham, Brenda and Joshua suffered psychologically. Surely, Brenda was horrified when she awoke to see her own brother attacking her with a claw hammer as she lay helpless in her own bed. During the attack, there was sufficient time for Brenda to fear not only for her life but to fear for the life of her three-year-old grandson who was sleeping just inches away. Certainly, Brenda experienced *41 mental suffering and agony upon realizing that her brother intended to kill not only her, but also her grandson and that she was helpless to prevent it. Joshua could not possibly have escaped mental suffering. He was awakened from sleep by the sounds of the attack on his grandmother. When he cried out, he saw his beloved uncle raise a claw hammer to him as well. Certainly, Joshua experienced extreme shock, fright, and horror before his death. The murders of Brenda McCutchin and Joshua Hodges were committed under circumstances that caused fear and pain to them before their deaths. While Brenda and Joshua lay dying or dead in their bed, the defendant left messages in various rooms of the house. He wrote, ‘Fuck this God,’ ‘Fuck this world,’ ‘I’ll be dead too,’ ‘It’s about to pick up,’ ‘Don’t look for me,’ ‘Tammy I love you Always Never 4-get Baby,’ ‘Killing is my business,’ and ‘My whole life I have been ran over. It’s stopping now.’ Afterward, the defendant retrieved the claw hammer and proceeded to Latham McCutchin’s house to kill Latham. The court finds that the murders of Brenda McCutchin and Joshua Hodges were conscienceless or pitiless crimes and unnecessarily torturous to the victims. The court finds that the brutality the defendant exhibited to Brenda and to Joshua exceeds that which is normally present in a capital case.
“The court finds that the State proved beyond a reasonable doubt that each of the murders of the three victims was especially heinous, atrocious or cruel compared to other capital offenses.”
(C. 850-53.) The trial court also found that the murders were committed by one act or pursuant to one scheme or course of conduct. Section 13A-5M$(9), Ala.Code 1975. The trial court’s sentencing order further reflects that the court also found as an aggravating circumstance in the count charging Brownfield with Latham’s death that the murder was committed during the commission of a first-degree burglary. Section 13A-5-49(4), Ala.Code 1975.
The State presented ample evidence indicating that the murders were committed by one act or pursuant to one scheme or course of conduct. Thus, this aggravating circumstance was correctly applied in this case.
Similarly, there was an abundance of evidence indicating that Brownfield went to Latham’s residence intending to kill him; thus, there was ample evidence that that murder was committed during the commission of a first-degree burglary. Therefore, this aggravating circumstance was correctly applied as to the count charging Brownfield with killing Latham.
Finally, for the circumstance that the murders were especially heinous, atrocious, or cruel to exist, the murders must have been unnecessarily torturous to the victims. See Ex parte Kyzer, 399 So.2d 330, 334 (Ala.1981). In this determination we must consider whether the violence involved in achieving the killing went beyond what was necessary to cause death, whether the victims experienced appreciable suffering after a swift assault, and whether there was psychological torture. See Norris v. State, 793 So.2d 847 (Ala.Crim.App.1999). The evidence supports the above-quoted portion of the trial court’s findings that the murders were especially heinous, atrocious, or cruel. Brownfield savagely bludgeoned to death his 47-year-old sister and her 3-year-old grandson as they lay helpless in their bed; both victims awakened upon the first blows, and each suffered defensive wounds among the many wounds sustained during the extended attacks; and Brenda surely *42 suffered knowing that she could not defend either herself or her young grandson as they were being beaten to death, as too did young Joshua, who was awakened from his sleep to the sight of his uncle attacking first his grandmother a few inches from him, and then the attack alternating between him and his grandmother. Similarly, 64-year-old Latham saw the commencement of the attack that killed him in his own home, at the hands of his brother-in-law; that attack lasted for some time as well, and Latham suffered a number of wounds, some defensive. Finally, the evidence indicated that the victims survived for some period following the commencement of the attacks. We have consistently held that brutal beatings that result in death meet the statutory definition of especially heinous, atrocious, or cruel. See Brooks v. State, 695 So.2d 176 (Ala.Crim.App.1996), aff'd, 695 So.2d 184 (1997); Smith v. State, 795 So.2d 788 (Ala.Crim.App.2000); Ashley v. State, 651 So.2d 1096 (Ala.Crim.App.1994); McGahee v. State, 632 So.2d 976 (Ala.Crim.App.), aff'd, 632 So.2d 981 (Ala.1993); Freeman v. State, 555 So.2d 196 (Ala.Crim.App.1988). Clearly, there was sufficient evidence from which the jury could conclude that the manner of death in this case was especially heinous, atrocious, or cruel when compared to other capital cases. Thus, this aggravating circumstance was correctly found by both the jury and the circuit court.
The trial court found one statutory mitigating circumstance was present— that Brownfield had no significant history of prior criminal activity. Section 13A-5-51 (1), Ala.Code 1975. The trial court’s sentencing order further addressed the evidence of nonstatutory mitigating circumstances that defense counsel had presented:
“During the penalty phase of the trial, the defendant presented evidence of nonstatutory mitigating circumstances.
“Evidence exists that the defendant, during his childhood, suffered from obesity, was rejected by his peers, and provided the primary care to his ailing parents. During adolescence, the defendant experimented with drugs to gain friendships. From the age of twenty years to the age of twenty-four years, the defendant made a lot of friends but was regularly abusing drugs. The following years, the defendant’s drug use continued to worsen. The court finds that the defendant suffered from a substance dependence disorder that went untreated.
“The defendant presented evidence that he suffers from dysthymic disorder, a mental illness that exists when a person has chronic feelings of sadness and low, self-esteem. The court recognizes that the defendant experienced periods of sadness — and low self-esteem during his life but does not find that these periods were severe or chronic. The evidence shows that the defendant was doted on by his parents and had a relatively happy childhood. During early adulthood, the defendant socialized with his extended family and friends and maintained employment. The defendant was able to function appropriately in society although he did not always choose to do so.
“The defendant presented evidence that he was detrimentally affected by the death of his parents. Surely, the defendant experienced sadness and loss by the death of his parents. The defendant was an adult, however, when his parents died. The court does not find that the defendant was harmed by his parents’ deaths.
“The evidence established that the defendant demonstrated the capacity to love and care for another human being *43 during his life. The defendant loved and cared for his elderly parents. The evidence further established that the defendant had friends and relatives that cared for him.
“Based on the evidence, the court finds that the defendant is a low risk for future violence in prison and would adapt well to prison environment. The court finds that, once taken into custody, the defendant cooperated with law enforcement and confessed to the crimes. The court further finds that the defendant has expressed remorse for the deaths of the victims.”
(C. 359-60.) The circuit court weighed the aggravating circumstances and the mitigating circumstances, considered the jury’s recommendation of death, and sentenced Brownfield to death. Contrary to Brownfield’s bare assertion on appeal, there is no indication that either the jury’s advisory verdict or the trial court’s imposition of the death penalty was imposed as a result of passion, prejudice, or some other arbitrary factor.
Pursuant to § 13A-5-53(b)(2), Ala.Code 1975, we must independently weigh the aggravating circumstances and the mitigating circumstances to determine the propriety of Brownfield’s sentence of death. Brownfield, in a cold and brutal manner, savagely beat his 47-year-old sister, Brenda, and her 3-year-old grandson, Joshua, to death with a hammer and then wrote assorted comments on the walls and attempted to set fire to the house. He then drove across town to the house where his 64-year-old brother-in-law, Latham, lived, which he entered under the ruse of a friendly visit, before killing Latham by savagely beating him with the same hammer he had used to kill Brenda and Joshua and stabbing him in the heart with a knife. Further, the evidence indicated that all three victims suffered defensive wounds and that they survived the initial blows and were alive for some period during the attacks. This Court is convinced, after independently weighing the aggravating circumstances and the mitigating circumstances, that death was the appropriate punishment in this case.
Brownfield’s sentence was neither disproportionate nor excessive when compared to penalties imposed in similar cases. See Brooks v. State, 695 So.2d 176 (Ala.Crim.App.1996), aff'd, 695 So.2d 184 (1997); Smith v. State, 795 So.2d 788 (Ala.Crim.App.2000); Ashley v. State, 651 So.2d 1096 (Ala.Crim.App.1994); McGahee v. State, 632 So.2d 976 (Ala.Crim.App.), aff'd, 632 So.2d 981 (Ala.1993); Freeman v. State, 555 So.2d 196 (Ala.Crim.App.1988).
Last, we have searched the record for any error that may have adversely affected Brownfield’s substantial rights and have found none. See Rule 45A, Ala.R.App.P.
Brownfield’s convictions and sentence to death are due to be, and are hereby, affirmed.
AFFIRMED.
BASCHAB, P.J., and SHAW, WISE, and WELCH, JJ., concur.

. Although the trial transcript contains punctuation marks such as periods, the exhibits indicate that this writing on the wall con-lained only a period at the end of the comment.

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. Brownfield raised this claim in a supplemental brief filed with this Court before the State filed its brief. The State addressed this claim in its brief.

. Investigator Hood stated that, although he read the Miranda rights to Brownfield at the beginning of the interview and Brownfield indicated that he understood and wished to speak with them, Brownfield did not actually sign the card until the interview was concluded.

. There was an extended discussion regarding the absence of the defense experts at the suppression hearing. The record indicates that the suppression hearing had been continued a number of times; the State’s evidence had been presented and then the hearing continued for two weeks to allow the defense to prepare and call its witnesses. Brownfield did not raise on appeal the trial court’s denial of his motion for an additional continuance so that he could secure the presence of his expert witnesses at the suppression hearing; we find no plain error in the trial court’s refusal to grant another continuance approximately one week before trial.

. We note that although Brownfield's expert witnesses did not testify at the suppression hearing, they did testify at trial to the effect that Brownfield was unable to knowingly or voluntarily waive his Miranda rights or consent to the search of the automobile because of his ingestion of Xanax and ciystal methamphetamine. Although not specifically noted in the trial court’s order denying Brownfield's motion to suppress the evidence, the trial court obviously resolved any credibility choices regarding Brownfield's mental state in favor of the State, as is evidenced by the trial court’s findings in its sentencing order concerning mitigating evidence of Brownfield's alleged ingestion of drugs.

. The State acknowledges that, although Brownfield's sister Brenda, and not Brownfield, was the owner of the automobile, Brownfield's lack of standing to challenge the search of the vehicle was not raised at trial and has therefore been waived. Thus, for purposes of this opinion, we assume that Brownfield had standing to challenge the search of the vehicle. See, e.g., Washington, 922 So.2d at 163.

. We note that at the request of the defense, the trial court cautioned the jury that the 911-dispatch log was not offered for the truth of the matter asserted. We also note that no such instruction was requested or given with regard to Goode’s testimony regarding her statements during the 911 call. While the better practice may have been to give a limiting instruction, in the context of this case based on the evidence presented at trial, the lack of such a limiting instruction did not amount to reversible error.

. This Court notes that December 23, 2001, was a Sunday.

. We note that the officer on the videotape did not state that a witness had seen Brownfield at the Wallace Lane residence on December 24. Rather, the officer asked Brownfield why he went back to the residence, told Brownfield that some folks had seen him at the residence, and asked Brownfield if he remembered getting his automobile jump-started.

. We note that Brownfield does not challenge the admissibility of the DNA evidence itself. Rather, his specific arguments take issue with Jones's qualifications as an expert. Thus, we need not discuss in detail the admissibility of the evidence itself other than to note that there was no error, plain or otherwise, in the admission of the DNA evidence at trial. See generally Blackmon v. State, 7 So.3d 397 (Ala.Crim.App.2005) (opinion on application for rehearing) (discussing the application of the Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), analysis to determine the admissibility of PCR DNA evidence.).

. The State avers that this issue is raised for the first time on appeal. We note that Brownfield filed a motion challenging the admissibility of the DNA evidence prior to trial, and that the trial court conducted a hearing outside of the hearing of the jury to determine the admissibility of the evidence. At that hearing, Brownfield questioned Jones extensively as to her knowledge, skill, training, and areas of expertise. It appears that the trial court understood Brownfield’s questioning to challenge Jones's competency to testify as an expert on the proffered DNA evidence. Even assuming that the specific allegations were preserved for appellate review, for the reasons that follow, we find no error, plain or otherwise.